Lucille Hardy PRICE et al.,
Plaintiffs,

v.

HAL ROACH STUDIOS, INC., et al.,
Defendants.

No. 71 Civ. 413.

United States District Court,
S. D. New York.

June 26, 1975.

Golenbock & Barell, New York City, for plaintiffs.

Pryor, Braun, Cashman & Sherman, New York City, for defendants Hal Roach Studios, Inc: and Herbert Gelbspan.

Lynne Anderson Warren, Green Farms, Conn., for defendant Richard Feiner and Co., Inc. and Richard Feiner, individually.

Engelman, Kiernan & Fishman, New York City, for defendant Overseas Programming Companies, Ltd.

## OPINION

STEWART, District Judge:

This action involves a dispute over the ownership of the commercial rights to use the names and likenesses of Stanley Laurel and Oliver Hardy ("Laurel and Hardy"), the two famous comedians both now deceased. The complaint was

filed on January 29, 1971 by plaintiff Larry Harmon Pictures Corporation ("Harmon"), a California corporation, against defendants Hal Roach Studios, Inc. ("Roach"), a Delaware corporation with its principal place of business in New York, and Richard Feiner & Co. ("Feiner"), a New York partnership. Jurisdiction is predicated upon diversity of citizenship. 28 U.S.C. § 1332. Plaintiff later moved for an order granting leave to file an amended and supplemental complaint and for an order granting Lucille Hardy Price ("Price") and Ida K. Laurel leave to intervene as parties-plaintiff in this action. Those motions were originally "marked off the calendar for non-appearance" by order of this court dated June 27, 1972. Defendants then moved to add Herbert Gelbspan, Executive Vice-President of defendant Roach, Richard Feiner, President of defendant Feiner, and Overseas Programming Companies, Ltd. ("Overseas") as defendants. On September 25, 1972, both plaintiffs' and defendants' motions were granted in a decision requiring an order to be settled upon ten days' notice. No order was ever drawn up by the parties who were apparently under the mistaken belief that no order was required to implement that oral decision. Nevertheless, all the parties have assumed from that time that the motions had been granted and have proceeded upon that basis. Therefore, we deem it unnecessary at this stage to require an order effecting that which the court has already granted and which the parties all assumed had been settled.[1] We proceed, therefore, on the basis of the amended complaint and acknowledge the additional parties-plaintiff and parties-defendant to this action.

## 1. *Nature of the Action*

Plaintiffs Price and Laurel are the widows of Oliver Hardy and Stanley Laurel, respectively, and are the sole beneficiaries of their estates under their wills. Plaintiff Harmon is engaged in the business of producing and distributing films and of licensing toys and games. Harmon is party to an agreement dated March 21, 1961 between it and Stanley Laurel, plaintiff Price, and Laurel and Hardy Feature Productions [2] which granted Harmon the right to acquire in perpetuity the exclusive right to utilize and merchandise the names, likenesses, characters and characterizations of Laurel and Hardy.

Defendant Roach is the purported holder of certain copyrights to Laurel and Hardy motion pictures. In February, 1971, Roach acquired the name and assets of Hal Roach Studios, Inc., a New York corporation ("Roach-New York"), which previously, in September, 1967, had acquired the name and assets of Hal Roach Studios, Inc. ("Roach-California"), a California corporation, by virtue of an order of the United States District Court for the Middle District of Pennsylvania. It was Roach-California, then a debtor in reorganization under Chapter X of the Bankruptcy Act, which originally held these copyrights alleged to have been acquired by Roach through Roach-New York.

Defendant Roach also claims by virtue of the acquisition of Roach-California to be the successor-in-interest to rights derived from certain employment agreements entered into between Roach-California and Laurel and Hardy. Presumably relying on the above-acquired interest, Roach entered into an agreement on May 1, 1969 with defendant Feiner, revised by later agreement dated January 21, 1971, purporting to convey to Feiner the "world-wide exclusive merchandising rights" to the names and likenesses of Laurel and Hardy. On those same two dates, Feiner, in turn, purported to convey to Overseas those

---

1. See Stipulation dated October 24, 1972.

2. This corporation was formed on October 16, 1939 under the laws of the State of California to employ Laurel and Hardy to produce motion pictures.

same exclusive merchandising rights outside the United States.

In the present action, plaintiffs claim that defendants are not legally entitled to the rights which they claim and that their claims are in conflict with the exclusive rights granted to plaintiff Harmon.

The amended complaint asserts five causes of action against defendants. First, plaintiffs claim that the 1969 and 1971 agreements between Roach and Feiner and Overseas were "unauthorized by plaintiffs" and "constitute a wilfull, unauthorized and wrongful appropriation of the commercial Laurel and Hardy rights." Plaintiffs here seek an accounting of profits. Second, plaintiffs allege that defendants' exploitation has caused confusion in the marketplace as to the true ownership of the commercial rights to Laurel and Hardy thereby depreciating their value and causing irreparable harm for which plaintiffs seek injunctive relief. The third cause of action alleges a conspiracy between Gelbspan and Richard Feiner to appropriate the commercial Laurel and Hardy rights. Plaintiffs seek an accounting of the unjust enrichment caused by this conspiracy. Fourth, plaintiffs seek damages of not less than $250,000 for interference with plaintiffs' property rights and a similar distinct amount for conversion of plaintiffs' property rights. Finally, plaintiffs seek punitive damages, claiming the appropriation and conversion of plaintiffs' rights was accomplished "wilfully . . . maliciously and with full knowledge of plaintiffs' rights."

Defendant Overseas has moved to dismiss plaintiffs' first, second, fourth and fifth causes of action and for summary judgment. In addition, defendant Overseas seeks a declaratory judgment that Overseas is the sole owner of certain Laurel and Hardy rights granted to it by defendant Feiner. All other defendants have joined in the relief sought by Overseas. Plaintiffs also have moved for summary judgment. While no notice of motion was ever filed, plaintiffs'

motion apparently was made orally before another judge of this court and all supporting affidavits and memoranda of law were filed thereafter. For the reasons set forth below, we grant declaratory and injunctive relief in favor of plaintiffs. We deny plaintiffs' request for an accounting and for punitive damages. Determination of actual damages for wrongful conversion will be determined at a later hearing.

## 2. Defendants' Claims

Defendants claim their prior and exclusive rights derive from defendant Roach and its predecessors Roach-California and Roach-New York. Defendants allege they are exclusively entitled to utilize commercially the names and likenesses of Laurel and Hardy and request injunctive relief against any such use by plaintiffs.

Defendants argue essentially three theories to support their claim of exclusive or concurrent right to commercial use of the names and likenesses of Laurel and Hardy. First, they contend that certain employment agreements entered into between Roach and Laurel and Hardy entitle them to exclusive right. Second, they maintain that they hold copyrights of certain motion pictures which give rise to the claimed rights. Finally, they assert that they are at least entitled to use the comedians' names and likenesses along with the general public since they are now in the public domain, either because plaintiffs never had any exclusive right to their names and likenesses or because they waived any rights which they had.

We will discuss each of these claims in turn.

## 3. The Employment Contracts

Between 1923 and 1939, Laurel and Hardy separately entered into a number of contracts to render services as motion picture actors to Roach-California. In interrogatories, defendant Roach was asked to identify any provision within these contracts upon which defendants

rely for their claim to sole and exclusive use of the names and likenesses of Laurel and Hardy. Defendant Roach replied that it relies upon the contracts but failed to specify any provisions, stating: "Defendant respectfully refers [plaintiffs] to the original of the agreements . . . and states that each agreement must be read in its entirety for the meaning and effect of its terms." We agree with plaintiffs' characterization of this response as "evasive." In the absence of any specification by defendants of the relevant contract clauses, we have sought to determine which portions of the contracts bear on the rights in issue in this case.

While the language of the contracts varies, certain provisions which we find bear on the rights in dispute here are common to all of the contracts. First, each contract contains a clause granting Roach the exclusive right to photograph and record the "acts, poses, plays and appearances" of each of the actors. Then, each contract provides that Roach would have sole and exclusive ownership of such photographs and the right to copyright the materials produced. Finally, the contracts contain a provision granting Roach certain rights to use each actor's "name, voice and likeness for advertising, commercial and/or publicity purposes."

The first two common provisions relating to phography do not appear to be in dispute among the parties. Plaintiffs do not challenge defendants' right to the ownership and use of the films produced and copyrighted while Laurel and Hardy were each under separate contract to defendant Roach. Plaintiffs do contest, however, defendants' claimed rights arising from the third provision, that is, the use of the names and likenesses of Laurel and Hardy.

It is in the contractual provisions relating to the ownership and use of the photography not in the provision granting rights to use their names and likenesses where language is used to grant rights beyond the term of the specific contracts.[3] Those provisions grant to Roach the exclusive rights to photograph, copyright, and reproduce all the "acts, poses, plays and appearances" of Laurel and Hardy for the contract term and "perpetually." The context in which the perpetual grant appears, however, makes it clear that what is granted to Roach in perpetuity relates to the specific photographic reproductions and not to a perpetual and exclusive use in every context of the names and likenesses of Laurel and Hardy. This construction becomes clearer when we examine the contract provisions relating specifically to the use of the names and likenesses of Laurel and Hardy.

Some of the contracts contain a very limited grant of that use to Roach for advertising publicity only "in connection with all the pictures in the production of which [Laurel/Hardy] may take part . . . ." Other contracts provide Roach with a broader right to use the actors' names and likenesses: "the sole and exclusive right to make use of [Laurel's/Hardy's] name for advertising, commercial and/or publicity pur-

---

3. See, e. g., paragraph fourth of the Hardy contract dated November 11, 1929 set forth here in full:

The second party expressly gives and grants to the first party the sole and exclusive right to photograph any and all of his acts, poses, plays, and appearances of any and all kinds, and the right to record and/or reproduce his voice and all instrumental and/or musical and/or other sound effects of any and all kinds during the term hereof, and to produce or reproduce the same by any method whether now known or not, and the first party shall have the exclusive and complete control, right, title and property and the right of copyright in and to all the foregoing things, and any and all parts thereof, as well as in and to the name of the second party for any of such purposes during the term hereof and perpetually in connection with all productions in which the second party appears under the provisions hereof, as fully and completely and to all intents and purposes, as the second party could or would have enjoyed the same in the absence of this agreement.

poses, as well as the sole and exclusive right to make use of and distribute [Laurel's/Hardy's] pictures, photographs and other reproductions of [Laurel's/Hardy's] physical likeness.'" These provisions, however, are always expressly limited to the "term" of the contract.

■ Defendants might wish us to read the contracts in their entirety rather than separately in determining which rights belonging to the actors were being relinquished and for what duration. We are unable to proceed upon such a basis. We find that the parties carefully contracted with respect to different rights using separate and distinct phrases to designate those rights. *See Republic Pictures Corp. v. Rogers,* 213 F.2d 662 (9th Cir. 1954) (separating similar provisions).

There is one additional provision appearing in one of the contracts between Roach and Laurel which bears upon our interpretation of these contracts. "Paragraph Sixteenth" in the April 8, 1935 contract provides that Laurel would have the right during the term of the contract to appear in radio broadcasts in the course of advertising products; the programs were to be "purely . . . sponsored for the advertising and promotion of sale of merchandise." The contract further provides that Hardy was to have this same right although he had previously signed a separate contract without such a provision. This provision is really the only one in all the contracts which bears specifically upon the understanding between defendant Roach and the comedians regarding the use of their names and likenesses for commercial purposes unrelated to the commercial advertising of the Roach movie productions. This clause demonstrates to us that when the problem arose of Laurel and Hardy using their names and likenesses for commercial advertising of products other than products of photography, provision was made to allow such use. It was thought necessary to provide that permission, however, only during the term of the contract. The language suggests to us that neither party contemplated any ownership by Roach of the exclusive use of Laurel's or Hardy's name and likeness beyond the contractual term. When Laurel and Hardy severed their contractual ties with Roach in 1939, while quite obviously continuing their work, Roach did not claim any entitlement to exclusive use of their names and likenesses for all purposes, apparently because such right was neither contemplated by the parties nor specifically provided for in the contracts.

After these motions for summary judgment had been *sub judice* for approximately two months, defendants claimed that they had "newly discovered evidence." Accordingly, this court granted defendant Feiner's request to submit additional evidence. The new evidence consisted of an affidavit by defendant Feiner and accompanying exhibits. Since the affidavit and exhibits purport to bear upon defendants' claims arising from the above contractual provisions, we discuss these items at this point.

■ Plaintiffs have requested that the supplemental affidavit and exhibits be rejected on a number of grounds. First, plaintiffs claim the affidavit does not comport with Rule 56 of the Federal Rules of Civil Procedure which requires that affidavits on motions for summary judgment be made on personal knowledge and set forth facts which would be admissible in evidence. Plaintiffs argue that this affidavit was not so made, nor does it demonstrate that Feiner is competent to testify as to the matters stated in the affidavit. Second, plaintiffs contend that the affidavit does not present "new evidence" despite defendants' representations to the contrary. Next, plaintiffs argue that the substance of the affidavit and exhibits is "utterly irrelevant" to any of the issues before the court. Finally, plaintiffs maintain that defendants' failure to produce the documents appended to the Feiner affidavit

in response to plaintiffs' demand for discovery three years before and Feiner's failure to offer any explanation as to why he so failed or how they were recently obtained compels the court to preclude their submission. We tend to agree with plaintiffs' arguments. On the issue of whether the evidence was "new," we find particularly persuasive plaintiffs' allegation that Exhibit 1, a copyright search by the copyright office for plaintiffs' interests in any works, appears, in the absence of explanation, to have been in defendant Feiner's possession for more than four months prior to argument on these motions. Since we also find plaintiffs' other arguments persuasive, especially that the offered exhibits 2–17 utterly fail to support the conclusions stated in the Feiner affidavit, we grant plaintiffs' motion to strike the affidavit and all the accompanying exhibits.

█ The Feiner affidavit claims that the documentation in its accompanying exhibits "clearly discloses the grant by Laurel and Hardy of all commercial and merchandising rights to Roach without limitation." The first exhibit is a search of the register of copyrights which apparently discloses, *inter alia*, that Laurel and Hardy never filed any copyright registrations "during their lifetime." While defendants have argued that the failure of plaintiffs to obtain copyrights precludes them from asserting any rights to the commercial Laurel and Hardy rights, we disagree and find that the issue here is not one of copyright law. (*See infra* section 5).

Exhibits two through seventeen are similarly unpersuasive. These exhibits are alleged blow-ups of the press books used in connection with the release and exploitation by Roach of the motion pictures "Babes in Toyland" released in 1934 and "Chumps at Oxford" released in 1940. Four of these exhibits purportedly bear the signature of Laurel dated 1964. Thus, defendant Feiner concludes, Laurel knew of Roach's commercial exploitation 24 and 30 years after the pic-

tures' release and 25 years after the expiration of his last contract with Roach.

█ While it may be true that Laurel knew of Roach's commercial exploitation of his name and likeness, his signature in 1964, if in fact that is what the exhibit evidences, could only support the proposition that Laurel knew 25 years after his last contract that Roach had at some unidentified point in time commercially exploited Laurel's name and likeness. The "press books" are connected with motion pictures produced and released when the contracts were in force and when Roach had a contractual right to such commercial exploitation. There is no evidence in those exhibits of when any commercial exploitation took place, or even whether such exploitation did in fact occur. Certainly, the signature of Laurel, a man who Feiner stated "had a habit . . . of autographing things that were sent to him," (Conference Transcript, April 25, 1974, at 6), even dated 1964, does not indicate when any commercial use might have occurred. Thus, it can in no way bear upon the proper construction of the very extensively detailed contractual rights between the parties set forth in the agreements already discussed.

### 4. *The Roach Copyrights*

Defendants claim that their statutory copyrights to certain Laurel and Hardy motion pictures gives them a "prior right of protection against plaintiffs." (Overseas brief, at 7). Plaintiffs do not dispute defendants' right to worldwide distribution of copyrighted Laurel and Hardy motion pictures. In addition, plaintiffs concede that defendants, by virtue of their copyrights, are entitled to use "stills," or single frames, from the copyrighted movies. Neither the movies nor the stills, however, are at issue here.

█ Defendants have failed to produce any evidence or law in support of their argument that the motion picture copyrights, obtain by virtue of the contractual agreements entered into between

Laurel and Hardy and Roach, entitle them to exclusive use of the names and likenesses of Laurel and Hardy for all commercial purposes.

### 5. *Right of Publicity*

Finally, defendants contend they are not precluded from using the Laurel and Hardy names and likenesses which they claim are in the public domain either because plaintiffs never had an exclusive right to their commercial use, or, in the alternative, because plaintiffs waived whatever rights they had.

■ Many courts have recognized, as a property right, a person's use of his or her name and likeness. *See Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d 866 (2d Cir.), *cert. denied*, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); *Ettore v. Philco Television Broadcasting Corp.*, 229 F.2d 481 (3d Cir. 1956); *Uhlaender v. Henricksen*, 316 F.Supp. 1277 (D.Minn.1970). *See also Grant v. Esquire, Inc.*, 367 F.Supp. 876 (S.D.N.Y.1973). The commercial value of such a right stems from a person's ability to control its use.

> This right of publicity would usually yield [one] no money unless it could be made the subject of an exclusive grant which barred any other advertiser from using their pictures.

*Haelan Laboratories*, 202 F.2d at 868.[4]

■ While much confusion is generated by the notion that the right of publicity emanates from the classic right of privacy,[5] the two rights are clearly separable. The protection from intrusion upon an individual's privacy, on the one hand, and protection from appropriation of some element of an individual's personality for commercial exploitation, on the other hand, are different in theory and in scope.

■ In New York, there is a statutory right which protects living persons from commercial exploitation of their names and pictures by others without their written consent.[6] This statutory right, however, is deemed a "right of privacy" and is predicated upon the classic right of privacy's theoretical basis which is to prevent injury to feelings.[7] The Second Circuit, in rejecting an argument to restrict one's legal interest in the publication of his picture to such a so-called "right of privacy" stated:

> We think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, i. e., the right to grant the exclusive privilege of publishing his picture, and

---

4. The "right of publicity" is somewhat akin to the exclusive right of a commercial enterprise to the benefits to be derived from the goodwill and secondary meaning that it has managed to build up in its name. (citations omitted). *Grant v. Esquire, Inc.*, 367 F.Supp. 876, 879 (S.D.N.Y.1973).

5. *See* Gordon, *Right of Property In Name, Likeness, Personality and History* ("Right of Property"), 55 Nw.U.L.Rev. 553–557 (1960) discussing various scholars' theories regarding the right to privacy; Prosser, *Torts* ch. 22 § 112 (3d Ed. 1964); Green, *Right of Privacy*, 27 Ill.L.Rev. 237 (1932). *See also infra*, n. 7.

6. New York Civil Rights Law, McKinney's Consol.Laws, c. 6, §§ 50–51 (McKinney's 1948).

7. *See e. g., Flores v. Mosler Safe Co.*, 7 N.Y.2d 276, 196 N.Y.S.2d 975, 164 N.E.2d 853

(1959); *Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d at 868 ("right of privacy, i. e., a personal and non-assignable right not to have [one's] feelings hurt . . .."), *supra* n. 5. *See also Booth v. Curtis Pub. Co.*, 15 A.D.2d 343, 223 N.Y.S.2d 737, *aff'd*, 11 N.Y.2d 907, 228 N.Y.S.2d 468, 183 N.E.2d 812 (1962) ". . . [C]onfusion is no doubt engendered by the common use of the 'privacy' nomenclature under the statute [N.Y. Civil Rights Law § 50], and because of the statute's historical origins. Actually, the statute does not purport to protect all privacy, of which a public figure has preciously little, but rather, against commercial exploitation without written consent, to which a public figure is perhaps even more subject than a nonpublic person." 223 N.Y.S.2d 737, 745 n. 5. *Grant v. Esquire, Inc.*, 367 F.Supp. 876 (S.D.N.Y.1973).

that such a grant may validly be made "in gross," i. e., without an accompanying transfer of a business or of anything else. Whether it be labelled a "property" right is immaterial; for here, as often elsewhere, the tag "property" simply symbolizes the fact that courts enforce a claim which has pecuniary worth.

*Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d at 868. We think it is clear that, during their lifetimes, Laurel and Hardy each had such a property right, distinct from the statutory protection, in his name and likeness.

The question which remains open is whether the right of publicity terminates upon the death of the individual or whether it is descendible.[8] In arguing for termination of the right, defendants appear to confuse the two essentially different concepts, that is, the traditional right of privacy which clearly terminates upon death of the person asserting such a right[9] and the right of publicity which we think does not terminate upon death.

Since the theoretical basis for the classic right of privacy, and of the statutory right in New York, is to prevent injury to feelings,[10] death is a logical conclusion to any such claim. In addition, based upon the same theoretical foundation, such a right of privacy is not assignable during life. When determining the scope of the right of publicity, however, one must take into account the purely commercial nature of the protected right. Courts and commentators have done just that in recognizing the right of publicity as assignable.[11] There appears to be no logical reason to terminate this right upon death of the person protected. It is for this reason, presumably, that this publicity right has been deemed a "property right."[12]

If it is not "a matter of dispute that plaintiff has a valuable property right in his name, photograph and image and that he may sell these property rights," *Cepeda v. Swift and Co., supra*, 415 F.2d at 1206, then what policy should operate to cut off this right at death?

While authorities on the subject appear to be scarce, those considering the question have drawn a distinction between termination of a right to privacy at death and survival of a right of publicity:

> . . . in the case of exploiting the personality of an individual for profit, the courts might well overlook the defamation and allow the surviving relatives an action on the basis of profit-making from the exploitation of a deceased relative's personality.[13]

8. We are not here dealing with possible rights of "mere descendants" but rather with rights accruing to the heirs of Laurel and Hardy who presumably can made "an authentic proof of heirship." Gordon, *Right of Property*, supra n. 4 at 601. *See Schumann v. Loew's, Inc.*, 135 N.Y.S.2d 361 (Sup., N.Y.Cty.1954). Since Stanley Laurel was himself a party to the contract of assignment to plaintiff Harmon, Harmon's commercial rights to the Laurel name and likeness are indisputable during Laurel's lifetime absent a competing assignment claim. *See supra* section 2. Therefore, the question with regard to the Laurel rights is whether he could assign those rights beyond his lifetime and thus will his interest to his heirs.

9. *See supra* n. 4. *See also* N.Y. Civil Rights Law §§ 50–51 (McKinney's 1948) protecting only living persons.

10. *See supra* n. 6–7.

11. *See Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d at 868; Nimmer, Right of Publicity, 19 Law and Contemp.Prob. 201, 216 (1954).

12. *See* Gordon, *Right of Property*, supra at 607; *Cepeda v. Swift and Co.*, 415 F.2d 1205 at 1206 (8 Cir. 1969). *But see Haelan Laboratories v. Topps Chewing Gum*, 202 F.2d at 686 (label as property right was "immaterial").

13. Gordon, *Right of Property*, 55 Nw.U.L. Rev. at 599, *quoting* Green, *Right of Privacy*, 27 Ill.L.Rev. 237, 247–8 (1932). *See Lugosi v. Universal Pictures Co.*, 172 U.S.P.Q 541 (1972); Gordon, *Right of Property*, supra at 612–13. *See also* Nimmer, *Right of Publicity*, 19 Law & Contemp.Prob. 201 (1954); Brylawski, *Protection of Characters*

In *Lugosi v. Universal Pictures Co.*, 172 U.S.P.Q. 541 (1972), the heirs of Bela Lugosi sued Universal Pictures for, inter alia, misappropriation of property by licensing the merchandising rights to the character of Count Dracula as portrayed by Bela Lugosi. The Court held that

> Bela Lugosi's interest or right in his likeness and appearance as Count Dracula was a property right of such character and substance that it did not terminate with his death but descended to his heirs. Plaintiffs have established that they are the beneficiaries of such property right by distribution under Bela Lugosi's will. 172 U.S.P.Q. at 551.

The present case is easier to decide than *Lugosi* since we deal here with actors portraying themselves and developing their own characters rather than fictional characters which have been given a particular interpretation by an actor. This distinction removes the case from the kind of criticism lodged against recognition of such a right in *Supreme Records v. Decca Records*, 90 F.Supp. 904 (S.D.Cal.1950). There it was noted that if the court were to protect performances from imitation, "[it] would have to hold that . . . for instance . . . Sir Laurence Olivier could prohibit anyone else from adopting some innovations which he brought to the performance of Hamlet." 90 F.Supp. at 909.

Defendants in support of their claim that the right cannot survive death of the personality cite *Miller v. Universal Pictures Co.*, 11 A.D.2d 47, 201 N.Y.S.2d 632 (1st Dept. 1960), *aff'd* 10 N.Y.2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961), where the New York courts held that the widow of Glenn Miller, the musician, did not have any property interests in the Glenn Miller "sound." But the courts in that case did not determine the devolution rights of property but rather determined that neither plaintiff nor Miller himself ever had any such property right in the Glenn Miller "sound."

> Indeed, in the absence of palming off or confusion, even while Glenn Miller was alive, others might have meticulously duplicated or imitated his renditions. *Miller v. Universal Pictures Co., supra,* 11 A.D.2d at 49, 201 N.Y. S.2d at 634.[14]

*Miller*, therefore, is a case where the court found there was never any property right in the "sound" which the plaintiffs sought to protect and, thus, there could be no right of publicity. There are many such cases where a claim is too abstract to be a protectible right or thought to be mere imitation which is not protectible. For example, in *Booth v. Colgate-Palmolive Co., Inc.*, 362 F. Supp. 343 (S.D.N.Y.1973) (Bonsal, J.) the court found that a commercial with a voice-over imitation of plaintiff Booth in the role of the television character "Hazel" was not actionable as a right of publicity because the "commercials in issue here are anonymous and do not use plaintiff's name or likeness in any way to identify her as the source of the voice of Hazel. . . . " The present case is distinguishable from both *Miller* and *Booth*. Here we have determined that a property right does exist, such as the court was unable to find in *Miller*, and that we are not concerned with an "imitation" such as was found by the *Booth* court. Rather, we have here the situation specified by *Booth* as a different one where the challenge is to the use of a person's "name or likeness."

Defendants also cite recent Supreme Court cases involving federal copyright law, *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163

---

—Sam Spade Revisited, 22 Bul. Copyright Soc. no. 2 (1974) Dec.

14. In addition, it should be noted that the Second Circuit specifically limited its discussion of the term "property" in *Miller* to the context of capital gains taxation. 299 F.2d at 708.

(1973); *Sears, Roebuck & Co. v. Stiffel Co.*, 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed. 2d 661 (1964); *Compco Corp. v. Day-Brite Lighting, Inc.*, 376 U.S. 234, 84 S. Ct. 779, 11 L.Ed.2d 669 (1964), for the proposition that articles not protected by federal law from limitation are not otherwise protectible. We cannot agree that the federal copyright laws pre-empt a state-based right of publicity.

> . . . [W]here Congress determines that neither federal protection nor freedom from restraint is required by the national interest, it is at liberty to stay its hands entirely. Since state regulation would not then conflict with federal action, total relinquishment of the States' power to grant copyright protection cannot be inferred.

*Goldstein v. California*, 412 U.S. 546, 559, 93 S.Ct. 2303, 2311, 37 L.Ed.2d 163 (1972). The logic of this conclusion forecloses any argument here that forms of state protection other than copyright laws are precluded by federal pre-emption.

Having determined that plaintiffs here are asserting a valid property right for which protection should be afforded, we turn now to the question of whether there was any waiver of this right. First, defendants Roach and Gelbspan argue, in support of Overseas' motion for summary judgment on its cross-claim for declaratory relief, that plaintiffs' or their predecessors in interests' failure to carry a statutory copyright notice on a series of cartoons embodying caricatures of Laurel and Hardy constitutes "dedication" to the

public of their rights. Since we have not based plaintiffs' rights upon any statutory copyright, however, this argument is not pertinent. Defendants Roach and Gelbspan also argue that the failure of Laurel and Hardy to "use" their caricatures and imitations between 1940 and 1954 constitutes an "abandonment." Such an argument would appear nonsensical. It cannot be possible for Laurel and Hardy to lose rights in their own names and likenesses through "non-use." If a person chooses not to exercise the right of publicity, there is the attendant statutory right of privacy in New York which protects that person from commercial exploitation by others.[15] There cannot, therefore, be any necessity to exercise the right of publicity during one's life in order to protect it from use by others or to preserve any potential right of one's heirs.[16]

Finally, defendant Overseas appears to argue obliquely that Laurel and Hardy by becoming "public figures" waived any rights they might have had. The argument, which fails because of defendants' confusion between the right of publicity and the right of privacy, is that a public figure has no right of privacy. Defendant Overseas cites us to cases in which public figures or their heirs have unsuccessfully sued publications for invasion of privacy. These cases, which conclude that public figures essentially have no right of privacy in the context of first amendment freedoms of speech and press, are inapposite here.[17] We deal here instead with the right of publicity:

> There must be no waiver of the right by reason of the plaintiff being a well

---

15. *See Grant v. Esquire, Inc.*, 367 F.Supp. 876, 880 (S.D.N.Y.1973) (plaintiffs' non-use of commercial value of name and likeness does not preclude against others).

16. *See supra* n. 6.

17. *See Booth v. Curtis Pub. Co.*, 15 A.D.2d 343, 223 N.Y.S.2d 737, *aff'd* 11 N.Y.2d 907, 228 N.Y.S.2d 468, 183 N.E.2d 812 (1962). The following quotation from the *Booth* case construes New York's statutory right of privacy:

> ". . . Defendants' contention that a public figure has no right of privacy is rejected. Such contention confuses the fact that projection into the public arena may make for newsworthiness of one's activities, and all the hazards of publicity thus entailed, with the quite different and independent right to have one's personality, even if newsworthy, free from commercial exploitation at the hands of another. [citations omitted.] . . . That [plaintiff] may have voluntarily on occasion surrendered her privacy, for a price or

known personality. Indeed the right usually becomes important only when the plaintiff . . . has achieved in some degree a celebrated status.[18]

We find no evidence of any actions which would constitute a waiver of the rights to which we have decided plaintiffs have a valid claim.

*Conclusion*

Defendant Overseas seeks a declaratory judgment that it is the sole owner of the commercial Laurel and Hardy rights and that plaintiffs be adjudged to "have no rights of any nature whatsoever with respect to exploitation of the characters Laurel and Hardy in the entire geographical area outside the United States. . . . ." Since we have determined that the heirs of Laurel and Hardy are entitled to those commercial rights, the chain of ownership by which defendant Overseas claims its right is clearly faulty; Roach did not have the rights which it purported to grant to Feiner who attempted to convey a part thereof to Overseas. On this motion for summary judgment, therefore, declaratory relief is granted against defendants.[19]

Plaintiffs, in their second cause of action, request permanent injunctive relief against defendants' misuse of their property right. Since we have been able to determine the underlying rights of the parties on this motion for summary judgment, it is appropriate to enter such a permanent injunctive order. *See Chappell & Co. v. Frankel*, 367 F.2d 197, 203 (2d Cir. 1966); 6 Moore, *Federal Practice* ¶ 56.17[30] (2d ed. 1974). All parties are directed to submit proposed injunctive orders within ten days of notice of this decision, after which the court will issue an order.

In their first cause of action, plaintiffs request an accounting from defendants of any and all fees and profits received by them from their unauthorized and wrongful appropriation of the commercial Laurel and Hardy rights. Since under New York law the remedy of an accounting is only available where a fiduciary relationship is established between plaintiff and defendant, *see Bradkin v. Leverton*, 26 N.Y.2d 192, 199, 309 N.Y.S.2d 192, 198, 257 N. E.2d 643, 646 (1970); *Moscatelli v. Nordstrom*, 40 A.D.2d 903, 337 N.Y.S.2d 575 (1972); *Reyes v. Carver Fed'l Sav. & Loan Ass'n*, 74 Misc.2d 323, 344 N.Y. S.2d 501, 503 (Sp.T.1973), we grant summary judgment for defendants on so much of the complaint as asks for an accounting.

Finally, plaintiffs request actual and punitive damages for appropriation and conversion of plaintiffs' property right. On the basis of our decision, we believe plaintiffs are entitled to actual damages for appropriation of the commercial Laurel and Hardy rights. *Cf. Grant v. Esquire, Inc.*, 367 F.Supp. 876, 879 (S.D.N.Y.1973). It is necessary to prove malicious intent, however, in order to recover exemplary or punitive damages in New York.[20] In the instant case, plaintiffs have failed to support their allegation of malicious intent in their fifth cause of action with facts sufficient to make their claim of malice a genuine issue precluding summary judgment for defendants on the issue of

gratuitously, does not forever forfeit for anyone's commercial profit so much of her privacy as she has not relinquished." 223 N.Y.S.2d at 745.

18. Gordon, *Right of Property*, 55 Nw.U.L. Rev. at 607 (1960), quoting Nimmer, *Right of Publicity*, 19 Law and Contemp.Prob. 201, 216 (1954).

19. This decision obviates the need to give further consideration to defendant Overseas' request for injunctive relief against suits brought by plaintiffs outside the United States.

20. *See James v. Powell*, 19 N.Y.2d 249, 279 N.Y.S.2d 10, 225 N.E.2d 741 (1967); *Manekas v. Allied Discount Co.*, 6 Misc.2d 1079, 166 N.Y.S.2d 366 (S.Ct.1957) ("malicious intent" required to award punitive damages for conversion); *Grant v. Esquire, Inc.*, 367 F.Supp. 876 (S.D.N.Y.1973) ("bad faith" required to award punitive damages under § 51 of New York Civil Rights Law).

**848**

punitive damages. The appropriate amount of actual damages, requested by plaintiffs in their fourth cause of action, will be determined upon submission of briefs and a hearing.

 Finally, while it is unclear whether plaintiffs' motion for summary judgment included the third cause of action, we nevertheless find that plaintiffs' "bare bones statement of conspiracy [and] of injury . . . without any supporting facts permits dismissal. *See generally*, 2A Moore, *Federal Practice* ¶ 12.08 (2d ed. 1968)." *Heart Disease Research Foundation v. General Motors Corp.*, 463 F.2d 98, 99 (2d Cir. 1972) (construing antitrust complaint).

In sum, therefore, we grant declaratory relief in favor of plaintiffs on defendants' counterclaim. In addition, we grant summary judgment to plaintiffs on their second and fourth causes of action and to defendants on plaintiffs' first, third and fifth causes of action.

So ordered.