SOUTHEAST BANK, N. A., as Personal Representative of the Estate of TENNESSEE WILLIAMS, Deceased, Respondent, v JACK LAWRENCE et al., Appellants.

First Department, December 13, 1984

### APPEARANCES OF COUNSEL

*David Blasband* of counsel (*Robert C. Harris* with him on the brief; *Linden & Deutsch,* attorneys), for appellants.

*Leonard M. Marks* of counsel (*Terri E. Simon* and *Beth M. Schillinger* with him on the brief; *Gold, Farrell & Marks,* attorneys), for respondent.

### OPINION OF THE COURT

Ross, J.

Can the representative of the estate of a deceased public figure assert the right of publicity after his death? This novel issue is presented to us on this appeal.

Thomas Lanier Williams (Williams), better known as Tennessee Williams, died on February 25, 1983, in New York City. His will was filed in the Circuit Court of Monroe County, Florida, on March 1, 1983, and, pursuant to the terms of that will, the Southeast Bank, N. A., (Southeast), located in Miami, Florida, was named the personal representative of the estate, and appears as the plaintiff in this matter.

During his lifetime, Williams wrote 24 full-length plays, some of which are among the most popular and critically acclaimed plays in the history of American drama. Some of his best known works include: The Glass Menagerie, A Streetcar Named Desire, Summer and Smoke, The Rose Tattoo, Camino Real, Cat on a Hot Tin Roof, and The Night of the Iguana. Williams won two Pulitzer Prizes, as well as many other honors, including three New York Drama Critics' Circle Awards, the Antoinette Perry Award and a Presidential Medal of Freedom. He has been called one of the world's most noted playwrights.

According to Williams' agent, International Creative Management of New York City, which represented him for over 40 years, Williams jealously protected the proprietary rights to the use of his name and to his works. During his lifetime, Williams maintained complete artistic control of the production of his plays. This absolute control by Williams over the content of his work product did not terminate with his death since, through provisions of his will, he assured that, even after his demise, nobody would be permitted to tamper with his scripts. Thus, article VIII of Williams' will, in pertinent part, reads: "It is my wish that no play which I shall have written shall, for the purpose of presenting it as a first-class attraction on the English-speaking stage, be changed in any manner, whether such change shall be by way of completing it, or adding to it, or deleting from it, or in any other way revising it, except for the customary type of stage directions".

Moreover, even though Williams actively promoted himself as a famous person, he was very selective about lending his name to promote causes or artistic projects of others, in view of his desire to prevent the dilution of his world-wide reputation for excellence in his chosen field. Williams refused to associate his name with anything that he did not affirmatively support.

In the light of the record before us, we conclude that the name Tennessee Williams is synonymous with theatrical excellence.

A senior trust officer of Southeast states, in an affidavit, that since Williams' death his estate has received numerous requests for permission to utilize the name "Tennessee Williams", in connection with the production of various dramatic festivals and other such events. However, the estate, in conformity with Williams' practice of rejecting most of these types of requests when he was alive, has not approved any of them to date. In fact, the estate has only permitted properly licensed productions of Williams' works and that action has resulted in substantial revenue being realized by the estate.

At or about February, 1984, Southeast learned that the owner of a theatre, located at 359 West 48th Street, in Manhattan, intended to rename that theater the "TENNESSEE WILLIAMS". Heretofore, this theatre had been called the "Playhouse".

The owner of the subject theatre is Jarick Productions, Ltd. (Jarick), which is a New York corporation, and the principals of Jarick are Jack and Richard Lawrence,[1] who are residents of New York State. Jack Lawrence is the president of Jarick, and by his own admission, is known as a composer and lyricist of musical compositions. Furthermore, Jack Lawrence concedes that he has never sought permission from anyone to use the name of "Tennessee Williams". Our examination of the record indicates that Southeast has no affiliation with Jarick and, in addition, will have no control over the activities that will take place at the subject theatre. Accordingly, it is fair to conclude that Southeast will be unable to ensure that the quality of the productions presented there meet the standard set by "Tennessee Williams". Obviously, such lack of control can result in diminishing the value of the Williams name.

Jarick claims that the reason they chose to use the Williams name is "to honor the memory and contributions of one of America's greatest playwrights". Southeast disagrees, and contends that Jarick's real purpose is "to trade * * * upon the popularity, good will and high standards of dramatic excellence created by the efforts and achievements of Tennessee Williams."

Within days of learning of Jarick's plans, counsel for Southeast wrote a letter, dated February 10, 1984, to Jack Lawrence advising him that the Williams estate did not give its consent to Jarick's "use of Tennessee Williams' name"; and, demanded "that you cease and desist from any attempt to appropriate Tennessee Williams' name, or otherwise impair the rights of his Estate". Jack Lawrence acknowledges that he received this letter, but he never replied to Southeast. Thereafter, Southeast was informed that Jarick was proceeding with the renovation of the theatre; had erected a marquee identifying the theatre as the "TENNESSEE WILLIAMS", and planned to commence rehearsals and a publicity campaign concerning a musical production scheduled to open in March, 1984.

On February 24, 1984, plaintiff Southeast commenced the instant action against defendants Jarick and the Lawrences, by the service of a summons and complaint on the defendants, as well as an order to show cause, which brought on plaintiff's

---

1. Richard Lawrence is the secretary-treasurer of Jarick.

motion for a preliminary injunction. The complaint, in substance, seeks permanent injunctive relief against defendants' use of the "Tennessee Williams" name in violation of the estate's common-law right of publicity. By written stipulation, the defendants agreed to refrain from using the subject name in connection with their theatre, pending determination by Special Term, New York County, of plaintiff's application for a preliminary injunction. Exercising their right (CPLR 3025, subd [a]) to timely amend without leave, the plaintiff amended its complaint, by adding additional causes of action. Besides serving an answer, the defendants cross-moved to dismiss the complaint for failure to state a cause of action (CPLR 3211, subd [a], par 7). Defendants take the position that there is no common-law descendible right of publicity in New York. During the period that the motion and the cross motion were awaiting determination, each side deposed the other.

Ultimately, in the instant order on appeal, Special Term granted plaintiff's motion for a preliminary injunction and denied defendants' cross motion, upon the basis that plaintiff had met the requirements for preliminary injunctive relief (see *Chrysler Corp. v Fedders Corp.*, 63 AD2d 567), in that the plaintiff demonstrated that it has no adequate legal remedy;[2] that it has a reasonable likelihood of succeeding on the merits in establishing that the defendants had violated its common-law right of publicity; that it will suffer irreparable injury if an injunction is not granted and that a balancing of the equities favors plaintiff's position. Special Term denied defendants' application for a stay of the injunction, and it directed that the plaintiff post a $25,000 undertaking, which order has been complied with by the plaintiff. By order, dated May 10, 1984, we denied defendants' application for a stay, pending decision on appeal.[3]

Unlike the right of privacy, which has been recognized as a personal right (*Schuyler v Curtis*, 147 NY 434, 447), in that it protects a person's "right to be let alone",[4] the right of publicity has been recognized as a property right, in that "there is no question but that a celebrity has a legitimate proprietary interest in his public personality" (*Lombardo v Doyle, Dane & Bernbach*, 58 AD2d 620, 622).[5]

---

**2.** Since the plaintiff does not seek money damages, it must look to equity for relief.

**3.** In view of the injunction that is in effect, the defendants are presently operating their theatre under the name of "The Jack Lawrence Theatre".

**4.** Warren and Brandeis, The Right to Privacy, 4 Harv L Rev 193.

**5.** For example, "Tennessee Williams" allowed himself to be interviewed

It appears that the first mention[6] of the term "right of publicity" occurred more than 30 years ago, in *Haelan Labs. v Topps Chewing Gum* (202 F2d 866, 868 [CA2d], cert den 346 US 816). The *Haelan* case involved the right of a chewing gum manufacturer, who had obtained the sole right to reproduce a photograph of a baseball player, to stop a business rival from using photographs of the player involved. In deciding this case, the Federal court stated it would apply New York law, and, that New York, aside from the statutory right of privacy, recognized a "right of publicity".

The Second Circuit stated, in pertinent part: "We think that, in addition to and independent of that right of privacy (which in New York derives from statute), a man has a right in the publicity value of his photograph, *i.e.,* the right to grant the exclusive privilege of publishing his picture" (*Haelan Labs. v Topps Chewing Gum, supra,* p 868). Then the court went on to say: "This right might be called a 'right of publicity' " (*Haelan Labs. v Topps Chewing Gum, supra,* p 868). Furthermore, the court indicated that "[t]his right of publicity would usually yield [persons such as the ballplayer involved herein] no money unless it * * * barred any other advertiser from using their pictures" (*Haelan Labs. v Topps Chewing Gum, supra,* p 868).

After making the comments, set forth *supra,* the *Haelan* court significantly stated: "We think the New York decisions recognize such a right [of publicity]. See, e. g., Wood v. Lucy, Lady Duff Gordon, 222 N.Y. 88, 118 N.E. 214; Madison Square Garden Corp. v Universal Pictures Co., 255 App.Div. 459, 465, 7 N.Y.S.2d 845" (*Haelan Labs. v Topps Chewing Gum, supra,* p 868).

Surely, when the right of publicity applies to a public figure's photograph, even more so it would apply, in the instant case, to a public figure's name. We take judicial notice of the fact that "Tennessee Williams" name is far better known than his photograph.

As mentioned *supra,* the *Haelan* court cited the case of *Madison Sq. Garden Corp. v Universal Pictures Co.* (255 App Div 459 [1st Dept], *supra),* as an example of a New York court decision that recognizes the right of publicity. In the *Madison Sq. Garden*

---

and photographed from time to time, particularly when such media exposure would help to promote a forthcoming production of his work.

**6.** See Note, The Right of Publicity-Protection For Public Figures and Celebrities, 42 Brooklyn L Rev 527, 534; Note, An Assessment of the Commercial Exploitation Requirement as a Limit on the Right of Publicity, 96 Harv L Rev 1703; Felcher and Rubin, The Descendibility of the Right of Publicity: Is There Commercial Life After Death?, 89 Yale LJ 1125.

*Corp.* (*Garden*) case, the owner of the Garden brought an action against defendants, the motion picture producers and distributors, for distributing a moving picture that purported to show, *inter alia,* the New York Ranger's hockey team (a team controlled by plaintiff) in a hockey game. The *Garden* case was unanimously decided by our court and this court wrote, in pertinent part (pp 464-466): "Plaintiff had built up a valuable business licensing the use of genuine photographs taken in the Garden in feature moving pictures, and from that business had derived substantial revenue. That business had been created by the expenditure on plaintiff's part of large sums of money and of effort and skill in the management of its enterprise. In *Fisher* v. *Star Co.* (231 N.Y. 414, 428) the Court of Appeals said: 'Any civil right not unlawful in itself nor against public policy, that has acquired a pecuniary value, becomes a *property right* that is entitled to protection as such. The courts have frequently exercised this right. They have never refused to do so when the facts show that the failure to exercise equitable jurisdiction would permit unfair competition in trade or in any matter pertaining to a *property right.*' * * * The plaintiff clearly had a *property right* in its good name, its reputation, its good will built up at considerable expense, and its business in licensing genuine moving picture photographs to be used in feature films from which it had derived a substantial revenue" (emphasis added).

The " 'rationale for [protecting the right of publicity] is the straightforward one of preventing unjust enrichment by the theft of good will. No social purpose is served by having the defendant get free some aspect of the plaintiff that would have market value and for which he would normally pay' " (*Zacchini v Scripps-Howard Broadcasting Co.,* 433 US 562, 576).

Some cases have held that, in order for the right of publicity to descend, the celebrity must have exploited that right during his or her lifetime (*Marx Prods. v Day & Night Co.,* 689 F2d 317, 322 [CA2d]). In this case the court interpreted California law. If we apply this test to the instant case, we find, based upon the evidence, that, "Tennessee Williams" met that test by promoting himself in a number of ways. In 1975 he published an autobiography entitled: Memoirs; in 1978 he authorized a book of photographs and memorabilia entitled: The World of Tennessee Williams; and, in January, 1980, Williams actively supported and encouraged the Florida Keys Community College to establish the Tennessee Williams Fine Arts Center.

Although we find that Williams exploited his right of publicity when he was alive, we hold that there was no prerequisite for

Williams to have exercised this right when he was alive, "in order to protect it from use by others or to preserve any potential right of [Williams'] heirs" (*Price v Roach Studios,* 400 F Supp 836, 846 [SDNY]). In this case the court interpreted New York law.

The defendants contend that there is no common-law descendible right of publicity in New York. In support of that position, the defendants rely heavily upon the case of *Wojtowicz v Delacorte Press* (43 NY2d 858). Based upon our examination of the facts in *Wojtowicz,* we conclude that defendants' reliance on that case is misplaced. *Wojtowicz* dealt with an invasion of *privacy* claim, as a result of allegedly unreasonable publicity and this action was brought pursuant to sections 50 and 51 of the Civil Rights Law. The plaintiffs involved in *Wojtowicz* were not well-known celebrities, who had created nationwide reputations in a particular line of endeavor. Incidentally, the Court of Appeals found no violation of the Civil Rights Law in *Wojtowicz,* in view of the fact that "it is undisputed that plaintiffs' names, portraits or pictures were not used [by defendants] in the books or in the movie" (*Wojtowicz v Delacorte Press, supra,* p 860).

There can be no dispute that "Tennessee Williams" had a valuable property right in his name. In considering whether this right of publicity survived his death, "[t]here appears to be no logical reason to terminate this right upon death of the person protected. It is for this reason, presumably, that this publicity right has been deemed a 'property right'" (*Price v Roach Studios, supra,* p 844).

A number of courts have recognized the common-law right of publicity.[7] The benefit to a holder of this right "stems from a person's ability to control its use" (*Price v Roach Studios, supra,* p 843).

In fact, some States, such as Florida, Oklahoma and Utah, enacted the right of publicity into statutory law.[8] Nevertheless, our analysis of the legal authorities convinces us that there is a common-law right of publicity in New York,[9] and, that it is a property right, and, as such is descendible.

Our examination of the deposition of defendant Jack Lawrence leads us to the inevitable conclusion that defendant Jarick's choice of Williams' name for its theatre was not for the

---

**7.** Note, An Assessment of the Commercial Exploitation Requirement as a Limit on the Right of Publicity, 96 Harv L Rev 1703, 1707.

**8.** *Ibid.*

**9.** See, e.g., *Factors Etc. v Pro Arts,* 579 F2d 215, 221 (CA2d), cert den 440 US 908.

purpose of honoring him, but rather it was for the purpose of deriving financial benefit from the use of such an illustrious name. In passing, we note that in the case of other theatres in New York City, which are named after well-known theatrical personalities, such as the Ethel Barrymore, Helen Hayes and Eugene O'Neill, prior permission was obtained from the appropriate party before the theater was so named.

In view of our finding that "Tennessee Williams'" right of publicity survived his death, we agree with Special Term's grant of plaintiff's motion for a preliminary injunction.

Accordingly, the order, Supreme Court, New York County (Irving Kirschenbaum, J.), entered April 12, 1984, which granted the plaintiff's motion for a preliminary injunction enjoining the defendants from using the name "Tennessee Williams" on theatre marquees or in any advertising promotional campaigns, should be affirmed, with costs.

SANDLER, J. P. (concurring). In sustaining the order of Special Term granting plaintiff's motion for a preliminary injunction, the court's opinion relies in large part upon a group of Federal court decisions which, commencing with *Haelan Labs. v Topps Chewing Gum* (202 F2d 866, cert den 346 US 816) have concluded that New York would recognize, separate and apart from the right to privacy embodied in sections 50 and 51 of the Civil Rights Law, a right of publicity, and one that under appropriate circumstances would be descendible. (See *Hicks v Casablanca Records & Filmworks,* 464 F Supp 426; *Price v Roach Studios,* 400 F Supp 836; *Grant v Esquire, Inc.,* 367 F Supp 876; *Marx Prods. v Day & Night Co.,* 523 F Supp 485, revd on other grounds 689 F2d 317; see, also, *Zacchini v Scripps-Howard Broadcasting Co.,* 433 US 562.)

In the absence of any authoritative New York decision clearly to the contrary, it seems to me appropriate to give persuasive weight to this carefully considered body of opinions. The basic principles set forth in them seem to me clearly sound, notwithstanding the obvious and serious problem presented in determining the duration in individual situations of the right of publicity after the death of the person whose right has been infringed.

The critical question before us is whether the right of publicity as it has been developed is so closely related to the right sought to be protected in sections 50 and 51 of the Civil Rights Law, that these sections should be deemed to preclude the acceptance of this separate common-law right. As to this issue, I acknowledge some uncertainty as to whether the statutory

sections, which in terms prohibit the commercial or trade exploitation without consent of a person's name, picture or portrait, are correctly construed to permit a separate and distinct common-law cause of action on behalf of those whose name and picture have an established commercial value.

Although the court's opinion is correct that the facts in *Wojtowicz v Delacorte Press* (43 NY2d 858) presented a different issue, the comment of the Court of Appeals (at p 860) with regard to "judicial relief for invasion of privacy in consequence of unreasonable publicity" raises at least a question as to how the court will ultimately resolve the issue.

I think it possible for the result here reached to be supported on a more limited ground, although one difficult to fit into a familiar legal category, a ground that arises out of what seems to me the unusual use of the name that here occurred. It is surely an unacceptable proposition that the death of a major American dramatist should be regarded as a license to theatre owners to appropriate his name for commercial purposes by affixing it to the name of a theatre.

The untenability of the proposition contended for by the defendant is underlined if one considers the situation that would have been presented if more than one theatre owner had decided to so appropriate the name of Tennessee Williams. The courts would then have been confronted with the unseemly spectacle of a contest to determine the right to use the name of the deceased dramatist between contending parties, neither of whom have a principled right to exploit the name. If the defendant is correct, the Williams name could have been affixed by theatres in every city in this country. Apart from the potential damage to the legitimate commercial interests of the estate, there is in this kind of name appropriation an obvious significant potential for deception and confusion, for the common understanding surely would have been that the use of the name was somehow approved either by the dramatist or those to whom he entrusted his affairs, and that the theatre was in some way associated with his body of work and his dramatic standards.

Looked at in another way, it seems to me clear that if the decision of the Court of Appeals in *Roberson v Rochester Folding Box Co.* (171 NY 538) had not been responded to by the enactment of sections 50 and 51 of the Civil Rights Law, and that a similar unconsented to use of the Williams name had been undertaken during his lifetime, the courts of this State would never have concluded that the *Roberson* decision precluded granting relief against this type of name misappropriation.

Since the statutory sections were enacted to address the problem presented in the *Roberson* decision, it would be anomalous to conclude that they precluded relief in a situation which surely would have been deemed appropriate for relief in the courts if these remedial statutory sections had not been adopted.

CARRO, MILONAS and KASSAL, JJ., concur with ROSS, J.; SANDLER, J. P., concurs in a separate opinion.

Order, Supreme Court, New York County, entered on April 12, 1984, unanimously affirmed. Respondent shall recover of appellants $75 costs and disbursements of this appeal.