**Lucille Hardy PRICE, Ida K. Laurel and Larry Harmon Pictures Corporation, Plaintiffs,**

v.

**WORLDVISION ENTERPRISES, INC. and Mermac Productions, Ltd., Defendants.**

No. 74 Civ. 748–CSH.

United States District Court, S. D. New York.

July 24, 1978.

55. Tr. 74, 77-78.

Golenbock & Barell, New York City, for plaintiffs.

Coudert Brothers, New York City, for defendants.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

Plaintiffs Lucille Hardy Price ("Mrs. Price"), Ida K. Laurel ("Mrs. Laurel") and Larry Harmon Pictures Corporation ("Harmon") commenced this action for injunctive relief and damages against defendants Worldvision Enterprises, Inc. ("Worldvision") and Mermac Productions, Ltd. ("Mermac"). Mrs. Price and Mrs. Laurel are the widows and beneficiaries, respectively, of those noted comedians of yesteryear, Oliver Hardy ("Hardy") and Stanley Laurel ("Laurel"). Harmon is engaged in the business of promoting and distributing films and of licensing toys and games. As the result of contractual relationships entered into in 1961, Harmon holds the exclusive right to utilize and merchandise the names, likenesses, characters and characterizations of Laurel and Hardy.

Worldvision is a distributor for independent television producers. Mermac is such a producer.

Plaintiffs seek to enjoin defendants from producing and distributing a television series entitled "Stan 'n Ollie", in which the

actors Chuck McCann and Jim MacGeorge, respectively, portray Hardy and Laurel. Plaintiffs now move for summary judgment pursuant to Rule 56, F.R.Civ.P. The motion asserts that, in the circumstances of the case, this Court's decision in *Price et al. v. Hal Roach Studios, Inc., et al.*, 400 F.Supp. 836 (S.D.N.Y.1975) (hereinafter *"Roach"*) has *res judicata* effect entitling them to the relief sought. The Court agrees. Summary judgment will be entered for plaintiffs.

## I.

The doctrine of *res judicata*, where applicable, has a salutary effect in the law. Parties are relieved of the burden and expense of relitigating the merits of a claim previously established. Relitigation of decided issues are equally wasteful of the resources of the trial courts.

These considerations cannot, of course, be exalted to the point where parties are deprived of their right to litigate issues which, in the totality of circumstances, cannot be regarded as having been determined. Thus *res judicata* is a limited concept, the limitations having been summarized by the Second Circuit in *Herendeen v. Champion International Corp.*, 525 F.2d 130, 133 (2d Cir. 1975):

"For a judgment in a prior action to be a bar to reaching the merits in a subsequent action it is firmly established that the prior judgment must have been rendered by a court of competent jurisdiction, been a final judgment on the merits, and that the same cause of action and the same parties or their privies were involved in both suits."

Plaintiffs contend that Judge Stewart's judgment in *Roach* satisfies these elements, thereby entitling them to summary judgment against the present defendants. Defendants do not dispute that *Roach* was rendered by a court of competent jurisdiction and constitutes a final judgment on the merits. The points at issue are whether there is a sufficient identity between plaintiffs' causes of action, and a sufficient degree of privity between the defendants. To evaluate those questions, *Roach* and the case at bar must be examined in further detail.

## II.

In *Roach* the plaintiffs were the same as those in this action. The defendants included Hall Roach Studios, Inc. ("Roach"); Richard Feiner & Co. ("Feiner"), and Overseas Programming Companies, Ltd. ("Overseas"). The amended complaint asserted five causes of action against the defendants. Judge Stewart granted plaintiffs summary judgment on the second and fourth causes of action. We examine these causes of action.

### Second Cause of Action

Plaintiffs in *Roach* alleged, and Judge Stewart found, that as the result of contractual relations commencing in March, 1961, plaintiff Harmon acquired "in perpetuity the exclusive right to utilize and merchandise the names, likenesses, characters and characterizations of Laurel and Hardy." *Roach* at 838.

Defendant Roach claimed to be the holder of certain copyrights to Laurel and Hardy pictures. Roach also claimed to be the successor in interest to rights derived from certain employment agreements entered into between its predecessor corporation and Laurel and Hardy. That asserted interest led to the following chain of contracts, as described by Judge Stewart:

"Presumably relying on the above-acquired interest, Roach entered into an agreement on May 1, 1969 with defendant Feiner, revised by later agreement dated January 21, 1971, purporting to convey to Feiner the 'world-wide exclusive merchandising rights' to the names and likenesses of Laurel and Hardy. On those same two dates, Feiner, in turn, purported to convey to Overseas those same exclusive merchandising rights outside the United States." *Roach* at 838.

Plaintiffs commenced their action against Roach and Feiner on January 29, 1971, adding Overseas as a defendant by subsequent amendment. Plaintiffs alleged, in summary, that:

".  .  . defendants are not legally entitled to the rights which they claim and that their claims are in conflict with the exclusive rights granted to plaintiff Harmon." *Roach* at 839.

Specifically, plaintiffs alleged in *Roach* that Roach, Feiner and Overseas were holding themselves out:

".  .  . as having and possessing the exclusive right to utilize the names, likenesses, characters, characterizations and mannerisms of Laurel and Hardy in the commercial exploitation of products and services in all media and have licensed others:

"a) to sell or license the sale of various products including toys, games, goods and other commercial products bearing the names, photographs and/or likenesses of Stan Laurel and Oliver Hardy;

"b) to utilize photographs of Stan Laurel and Oliver Hardy and/or to employ actors to portray and imitate the stylized likenesses, characterizations and mannerisms of Laurel and Hardy in order to advise and promote the sale of products; and

"c) to utilize the services of actors to portray and imitate the stylized likenesses of Laurel and Hardy on television or other media." Amended complaint in *Roach,* at ¶ 24, incorporated by reference in second cause of action.

These holdings out and license agreements were alleged by plaintiffs to have been without their authority, and to constitute a wrongful appropriation of their "commercial Laurel and Hardy rights." Amended complaint, ¶ 24. The second cause of action, praying for injunctive relief against Roach, Feiner and Overseas, alleged (¶ 30):

"Defendants' actions in holding themselves out as possessing the exclusive right to utilize the names, likenesses, characters, characterizations and mannerisms of Laurel and Hardy, including the placement of advertisements in trade magazines in which defendants have proclaimed exclusive ownership of such rights, have created confusion and uncertainty in the market place as to the ownership of the commercial Laurel and Hardy rights and have seriously diluted and depreciated their value, all to plaintiffs irreparable damage."

*Fourth Cause of Action*

In their fourth cause of action, arising out of the same factual background, the plaintiffs in *Roach* claimed money damages against Roach, Feiner and Overseas, and another individual whose status is not pertinent to the present case.

*The Case at Bar*

Following discovery procedures, plaintiffs moved on November 23, 1973 for summary judgment in *Roach.* Defendants cross-moved for summary judgment. Those motions were *sub judice* before Judge Stewart when, in early 1974, plaintiffs learned that the present defendants, Worldvision and Mermac, had produced and were about to distribute a pilot for a television series entitled the "Stan 'n Ollie" show, starring the actors McCann and MacGeorge, and commercially exploiting the names, likenesses, characters and characterizations of Laurel and Hardy. Plaintiffs contend, in the instant case, that whatever rights the present defendants assert to such commercial use derive from assignments or licenses granted to them by Roach and Feiner. In the *Roach* litigation plaintiffs urged that Roach and Feiner had no such rights to convey: within the context of that litigation, to Overseas. They thus viewed the Worldvision-Mermac venture as another example of wrongful conveyance by Roach and Feiner: this time to Worldvision and Mermac. Plaintiffs filed their complaint against the present defendants on February 14, 1974. The complaint sets forth the nature of the *Roach* litigation and the pendency of the summary judgment motions before Judge Stewart. The complaint in the case at bar alleges at ¶ 16:

"Upon information and belief any claim by defendants Worldvision and Mermac to the exercise of the commercial Laurel and Hardy rights in connection with the

production, distribution and exhibition of the video tape "Stan 'n Ollie", derives by assignment or license from the 'rights' claimed by Hal Roach Studios and/or Richard Feiner and Company; the existence and validity of said 'rights' is the subject for determination on the pending motion for summary judgment in *Price v. Roach*." [1]

*Disposition of the Roach Case*

Judge Stewart granted plaintiffs summary judgment on their second and fourth causes of action in an opinion rendered on June 26, 1975. He held that during their lifetimes Laurel and Hardy possessed a property "right of publicity" in their names and likenesses which they had never waived; which survived their death and was descendible to their widows as sole beneficiaries of their estates; and which had been legally and effectively conveyed to Harmon. Roach, on the other hand, was found by Judge Stewart never to have obtained such rights. In consequence, Feiner never obtained such rights from Roach, and had no valid basis to grant a license to Overseas.[2] In these circumstances, Judge Stewart entered a permanent injunction which reads in pertinent part as follows:

"ORDERED, that defendants Hal Roach Studios, Inc., Richard Feiner and Co., Inc., Overseas Programming Companies, Ltd., Richard Feiner and Herbert Gelbspan, their officers, agents and all persons acting on their behalf or in concert or cooperation with them are hereby permanently restrained and enjoined from using, selling, licensing, leasing, authorizing the use of or otherwise conveying or holding themselves out as in any manner authorized or empowered to use, sell, license, lease, or authorize the use of, or convey the names, likenesses, characters, and characterizations, of Stan Laurel and Oliver Hardy, (including, without limitation, use of their photographs or other reproductions of their physical likenesses, *the impersonation of their physical likenesses or appearances, costumes and mannerisms, and/or the simulation of their voices*) for advertising or commercial purposes, including their use in or in connection with publications, recordings, clothing, toys, games, foods, or other product or service, merchandising, or other product or service endorsements, or in the production of animated cartoons or motion pictures, separate and apart from the rights possessed by defendants Hal Roach Studios, Inc., Richard Feiner and Co., Inc. and Overseas Programming Companies, Ltd. by virtue of their copyrights in and to certain Laurel and Hardy motion pictures including all renewals and extensions thereof. . . ." (emphasis added).[3]

The Roach and Feiner defendants took no appeal from Judge Stewart's injunctive order. The present defendants do not deny, within the *res judicata* context, that the judgment in *Roach* was rendered by a court of competent jurisdiction and constitutes a final judgment on the merits. Thus the first elements enumerated in *Herendeen, supra,* are satisfied. The decisive question is whether "the same cause of action and the same parties or their privies were involved in both suits." *Herendeen* at 133. We turn to those questions.

III.

Plaintiffs contend, in essence, that (1) they assert precisely the same proprietary right that was vindicated in *Roach*; (2) the present defendants are pursuing precisely the same sort of commercial activities which were enjoined in *Roach*; and (3) the defendants base their entitlement to such

---

1. The foregoing discussion is based on the pleadings and on the affidavit of Michael C. Silberberg, dated September 15, 1977, at " " 10–12.

2. 400 F.Supp. at 843–847.

3. Plaintiffs in *Roach* did not challenge, and Judge Stewart's opinion and injunction did not disturb, the *Roach* defendants' right to worldwide distribution of certain copyrighted Laurel and Hardy motion pictures, or those defendants' right to use "stills" from them. 400 F.Supp. at 842.

activities solely upon a purported convey-ance to them from Roach and Feiner of rights which were held not to exist in *Roach.*

It is evident that, if no triable issue of fact exists with respect to the existence of these elements, then *res judicata* entitles plaintiffs to comparable injunctive relief against the present defendants. The first and second elements would establish the identity of the causes of action; and the third, the privity of the parties involved in the suits.

### A. *The Nature of the Right Asserted.*

The first element, *the identity of plain-tiffs' asserted right,* clearly appears. Plain-tiffs assert at bar the identical right which, by virtue of identical facts, they asserted in *Roach.* It is that "right of publicity" which Judge Stewart recognized and enforced in *Roach.* The right relates to the "commer-cial exploitation" of a person's "name and likeness." 400 F.Supp. at 843. Because of "the purely commercial nature of the pro-tected right," it is deemed a "property right." *Id.* at 844. The Second Circuit, citing *Roach* with approval in *Factors, Inc. v. Pro Arts, Inc.,* 579 F.2d 215 (decided June 27, 1978), summarized Judge Stewart's con-clusions as follows:

"*Price* involved a dispute over the owner-ship of the commercial right to use the names and likenesses of Stanley Laurel and Oliver Hardy ('Laurel and Hardy') following the death of the renowned co-medians. The exclusive right to exploit the comedy team commercially was as-signed to co-plaintiff Larry Harmon Pic-tures Corporation by Stan Laurel during his lifetime, by Oliver Hardy's widow and sole heir under Hardy's will, Lucille Har-dy Price, and by Laurel and Hardy's pro-duction company, Laurel and Hardy Fea-ture Productions. Several years later when the *Price* defendants sought to uti-lize the name and likeness of Laurel and Hardy, the owners sued. The district

court held that the deaths of the actors did not extinguish the right of publicity held by the grantee of the right." At 221.

It is that same right which the same plain-tiffs assert in the case at bar.

### B. *The Nature of Defendants' Activities.*

It is equally apparent that the second element, *the identity of the present defend-ants' activities,* is also present. The defend-ants in *Roach* claimed "exclusive or concur-rent right to commercial use of the names and likenesses of Laurel and Hardy." 400 F.Supp. at 839. The Second Circuit in *Fac-tors, Inc.* succinctly summarized the activi-ties of the defendants in *Roach*: they "sought to utilize the name and likenesses of Laurel and Hardy." At 221. It cannot be gainsaid that the present defendants have embarked upon a comparable commer-cial usage of "the name and likenesses of Laurel and Hardy." Defendants' television pilot and proposed series, "Stan 'n Ollie", features actors manifestly made up to re-semble Laurel and Hardy; any doubt is dispelled by the text accompanying World-vision's printed flyer [4] advertising the se-ries, which is subtitled:

"Laurel and Hardy—The Perfect Combi-nation for Primetime Access Program-ming";

and goes on to say:

"Chuck McCann plays the explosive Ollie opposite Jim Mac George's portrayal of the lovable, bumbling Stan. They get involved in all types of side-splitting situ-ations which seem to end in total chaos with Ollie's indignant disclaimer '. . . a fine mess you've gotten us into!' "

The present defendants' "Stan 'n Ollie" filmed television series quite obviously con-stitutes commercial activity of the kind em-braced by Judge Stewart's injunction in *Roach,* which extended, *inter alia,* to:

" . . . the impersonation of [Laurel and Hardy's] physical likenesses or ap-

---

**4.** The flyer, with actors McCann and Mac-George made up in the likenesses of Laurel and Hardy, together with accompanying text, ap-

pears as Ex. B to the Silberberg affidavit of September 15, 1977 in support of the motion.

pearances, costumes and mannerisms, and/or the simulation of their voices, for advertising or commercial purposes, including their use in or in connection with . . . the production of animated cartoons or motion pictures . . ."

In the face of this specific language, it is idle for defendants to argue that plaintiffs' protected rights are "limited to the use of the names and likenesses of the team in conjunction with the sale of products." [5] Defendants' affidavits insist that the litigation in *Roach* involved only "merchandising", which defendants define as follows:

" 'Merchandising' is the use of a person's name, portrait, or picture for pure advertising purposes. Thus for example there may be available to the public Laurel and Hardy T-shirts, dolls, toys, etc." [6]

Defendants say their activity "has nothing to do with merchandising." [7] I take this to mean they do not intend to market Laurel and Hardy T-shirts, dolls and toys. The case at bar may thus have nothing to do with "merchandising" as defendants define the term; it hardly follows that defendants' activities bear no resemblance to activities embraced by the *Roach* litigation and culminating injunction. Precisely the opposite is true as the plain words of Judge Stewart's opinion and injunction make clear.[8]

Defendants argue that they are engaged only in "mere imitation" of Laurel and Hardy, an activity to which the legally protected right of publicity does not extend.[9] In *Roach,* Judge Stewart recognized the existence of the "imitation" concept:

"There are many such cases where a claim is too abstract to be a protectible

right or thought to be mere imitation which is not protectible." 400 F.Supp. at 845.

Two of the cases Judge Stewart then proceeds to discuss, *Booth v. Colgate-Palmolive Co.,* 362 F.Supp. 343 (S.D.N.Y.1973), and *Miller v. Universal Pictures Co., Inc.,* 11 A.D.2d 47, 201 N.Y.S.2d 632 (1st Dept.1960), aff'd., 10 N.Y.2d 972, 224 N.Y.S.2d 662, 180 N.E.2d 248 (1961), are among the four upon which defendants rely. *Booth* and *Miller* are inapposite to the case at bar for the reasons stated by Judge Stewart in *Roach.* In *Miller,* the New York courts held only that neither the widow of Glenn Miller, the musician, nor Miller himself while alive had any property right in the so-called Glenn Miller "sound" generated by the orchestra under his direction. *Booth,* a decision of Judge Bonsal of this Court, was distinguished, together with *Miller,* by Judge Stewart in *Roach* in words fully applicable to the case at bar, and upon which I cannot improve:

" . . . in *Booth v. Colgate-Palmolive Co., Inc.,* 362 F.Supp. 343 (S.D.N.Y.1973) (Bonsal, J.) the court found that a commercial with a voice-over imitation of plaintiff Booth in the role of the television character 'Hazel' was not actionable as a right of publicity because the 'commercials in issue here are anonymous and do not use plaintiff's name or likeness in any way to identify her as the source of the voice of Hazel . . . .' The present case is distinguishable from both *Miller* and *Booth.* Here we have determined that a property right does exist,

---

5. Defendants' main brief at p. 10.

6. Affidavit of Robert Murray dated November 9, 1977 at p. 3.

7. *Ibid.*

8. As defendants' papers point out (see affidavit of Gordon T. King, Esq. dated November 9, 1977 and exhibits), one of plaintiffs' concerns in *Roach* was indeed the unauthorized "merchandising" of Laurel and Hardy products. But the scope of the Court's injunction in *Roach* quite clearly demonstrates the fallacy of King's conclusion (affidavit, p. 1) that "the *entire* thrust of the *Roach-Feiner* case was to stop

the defendants from engaging in the 'merchandising' of the Laurel and Hardy characters" (emphasis added). In point of fact, one of the license agreements submitted to Judge Stewart and ultimately made a target of his injunction was an agreement addressed by Feiner and Roach to 20th Century Fox Film Corporation, McCann and MacGeorge, purporting to authorize the utilization of the actors' services in portraying "the characters of Laurel and Hardy" in a television program. Silberberg affidavit at ' 18, p. 9; Ex. F.

9. See defendants' main brief at p. 8.

such as the court was unable to find in *Miller,* and that we are not concerned with an 'imitation' such as was found by the *Booth* court. Rather, we have here the situation specified by *Booth* as a different one where the challenge is to the use of a person's 'name or likeness.'" 400 F.Supp. at 845.

Defendants also cite *Sinatra v. Goodyear Tire & Rubber Co.,* 435 F.2d 711 (9th Cir. 1970), and *Davis v. Trans World Airlines,* 297 F.Supp. 1145 (C.D.Cal.1969). These cases, both construing California law, held that the defendants had not committed the tort of "passing-off"[10] where anonymous, unidentified singers in television commercials for products made use of particular songs popularized by the plaintiffs (Nancy Sinatra in the case bearing her name; the singing group "Fifth Dimension" in *Davis*). These cases are not in point because no comparable right of publicity was demonstrated by the plaintiffs, and the defendants' activities were quite different. To the extent that these cases are not distinguishable on those grounds, so that they conflict with *Roach,* I prefer to follow *Roach* as approved by the Second Circuit in *Factors, Inc., supra.*

We are clearly dealing with more than "imitation" in the case at bar. Defendants' appeal to that concept raises no triable issues of fact.

### C. The Source of Defendants' Asserted Rights.

We come, then, to the third element, *the identity of the source of defendants' asserted rights.* At issue here is the *res judicata* requirement that the same parties or their privies be involved in the two suits. The plaintiffs are the same here as in *Roach.*

The defendants are different. The question therefore arises as to whether the present defendants are in privity with the *Roach* defendants.

Resolution of that question turns upon the source of the present defendants' asserted rights to produce and distribute "Stan 'n Ollie". The parties' papers advance markedly different perceptions. Plaintiffs say that the present defendants "purported to act under licenses from [*Roach*] defendants Roach and Feiner."[11] Defendant Mermac ripostes that it "makes no claim that the Feiner contract constitutes its source of authority to use the likenesses of Oliver Hardy and Stan Laurel."[12]

■■ If plaintiffs are right in their contention, then the element of privity as between defendants is established. Privity is defined as "mutual *or successive* relationship to the same rights of property." *Litchfield v. Goodnow,* 123 U.S. 549, 550–551, 8 S.Ct. 210, 211, 31 L.Ed. 199 (1887) (emphasis added). The doctrine of *res judicata* is applicable "to assignees of parties as well as to the parties themselves." *Merchants Corporation of America v. 9655 Long Tons,* 238 F.Supp. 572, 574 (S.D.Tex.1965) (assignee from shipowner of freight monies to be earned by vessel in carriage of cargo bound, by *res judicata* principles, by judgment against shipowner holding that no freights were owing as the result of shipowner's breach of charter). See also *Tillman v. National City Bank,* 118 F.2d 631 (2d Cir. 1941); *Small Business Administration v. Taubman,* 459 F.2d 991 (9th Cir. 1972).

A determination that the present defendants purport to derive their production and distribution rights from the same Roach-Feiner agreements that were invalidated by

---

**10.** The Ninth Circuit in *Sinatra* adopted Dean Prosser's definition of "passing-off":

"Dean Prosser defines the tort of 'passing-off' as involving the basic idea of competing for custom in the trade. Thus it is: 'The making of some false representation to the public or to third persons, likely to induce them to believe that the goods or services of another are those of the plaintiff. * * * The test laid down in such cases has been

whether the resemblance is so great as to deceive the ordinary customer acting with the caution usually exercised in such transactions, so that he may mistake one for the other.' Prosser, Law of Torts 982–83 (1964)." 435 F.2d at 714–715.

**11.** Plaintiffs' main brief at p. 11.

**12.** Defendants' main brief at p. 5.

Judge Stewart in *Roach* would place the defendants in precisely the same position as Overseas Programming Companies, Ltd., the purported sub-licensee from Feiner whom Judge Stewart enjoined in *Roach.*

If, on the other hand, neither defendant Mermac nor defendant Worldvision, through Mermac, traces its source of authority through Feiner, then privity with the defendants in *Roach* does not exist, plaintiffs' appeal to the doctrine of *res judicata* fails, and the case must be tried.

The source of the present defendants' authority obviously poses an issue of material fact, within the context of the case. Under Rule 56(c), F.R.Civ.P., plaintiffs are entitled to summary judgment if the record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." It must therefore be determined whether the issue as to defendants' authority, as posed by the papers, is "genuine". In making that evaluation, I am mindful of the Second Circuit's declaration in *Heyman v. Commerce and Industry Co.*, 524 F.2d 1317, 1319 (2d Cir. 1975) that "on a motion for summary judgment the court cannot try issues of fact; it can only determine whether there are issues to be tried"; and that the court "must resolve all ambiguities and draw all reasonable inferences in favor of the party against whom summary judgment is sought . . . with the burden on the moving party to demonstrate the absence of any material fact issue genuinely in dispute . . . ."

Plaintiffs do not dispute that they have this burden. They contend, however, that the affidavits submitted by defendants in opposition to the motion for summary judgment depart so markedly from the prior deposition of defendants' key witness, and the contemporaneous documents, as to brand as bogus the factual issues sought to be raised. The Second Circuit has also stated generally, in *Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir. 1969):

> "If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."

In the case at bar, the most significant deposition was that given by Robert Murray, the President of Mermac, on December 22, 1976.[13] Judge Stewart's opinion in *Roach* had been handed down in June of 1975. Murray testified that Mermac was formed in 1973 for the purpose of producing the "Stan 'n Ollie" series.[14] Murray testified in detail in connection with his meetings with Richard Feiner, within the context of the "Stan 'n Ollie" project. Murray first met Feiner during the summer of 1973, in the company of Chuck McCann, the actor, who had performed on television with Laurel and Hardy puppets. This first meeting, at a restaurant, was entirely social; nothing was said about Laurel or Hardy at the meeting, or about a "Stan 'n Ollie" series; in point of fact, at his first meeting with Feiner, Murray had not commenced work upon such a series, or discussed it with anyone.[15]

It is apparent, however, that subsequent to that first, casual meeting Murray gave thought to a "Stan 'n Ollie" series based upon Laurel and Hardy. Some time in the fall of 1973, Feiner and Murray met in the latter's New York office. Murray met with Feiner because McCann had advised Murray that Feiner had to approve the commercial use of the Laurel and Hardy characters. Thus Murray testified:

Q. "Prior to this meeting, Mr. Murray, had anyone suggested or stated to you that Mr. Feiner purported to own rights in the characters Laurel and Hardy?"

A. "Yes."

**13.** The full transcript of the deposition appears as Ex. C to the Silberberg affidavit of September 15, 1977.

**14.** Tr. 3–4.

**15.** Tr. 5–7.

Q. "Who advised you of that fact?"

A. "Chuck McCann."

Q. "When did that take place?"

A. "I have no idea of any exact time at all."

Q. "Well, to the best of your recollection, what did Mr. McCann say to you about Mr. Feiner's purported ownership of the characters Laurel and Hardy?"

A. "That he had done commercials representing these characters and that any commercials he would have done and the agencies they were involved with, would always deal with Feiner, they had to give him the approval."

Q. "Did you ask Mr. McCann in words or substance, for the basis or the source of Mr. Feiner's rights or claimed rights?"

A. "I believe—hold it—it had something to do with Hal Roach." Tr. 9–10.

By the time of this fall meeting with Feiner, Murray was exploring in his own mind the possibility of producing a series based on Laurel and Hardy. While he could not at his deposition recall the details of his conversation with Feiner, the conversation related generally to "the possible utilization of the characters in some way, shape or form . . ."[16]

However, considerable light on what transpired at this meeting is cast by a letter dated October 25, 1973, which Feiner as President of Richard Feiner and Company, Inc. addressed to Murray as President of Mermac, several days after the meeting. That letter[17] reads in its entirety as follows:

25 October 1973

"MerMac Productions, Ltd.
146 East 49th Street
New York, New York 10017
Attention: Mr. Robert Murray
Gentlemen:

You have requested that we place in your hands this document to certify that there exists between us (MerMac & Feiner) the right to produce a television series based upon the Hal Roach Studios, Inc., Laurel and Hardy motion picture comedy format including the rights to draw upon approximately one-hundred copyright Laurel and Hardy motion picture photoplays. It has been agreed that your company is to be the producing or co-producing facility and shall include the right for Chuck McCann to portray Oliver Hardy and Jim MacGeorge to portray Stan Laurel.

We would be pleased to have our counselor confirm the above with any interested client that you may secure. You are authorized to display this letter as a representation of our warrantee to MerMac Productions, Inc. The right to display this letter beyond the 1st of February 1974 shall require our written authorization to MerMac.

Very truly yours,

RICHARD FEINER AND COMPANY, INC.

s/ Richard Feiner

Richard Feiner
President"

It is interesting to observe that the stationery of Richard Feiner and Company, Inc. was embossed with caricatures of Laurel and Hardy—a graphic proclamation of the company's authority to traffic in commerce affecting the two comedians.

Murray had obtained this letter from Feiner at the suggestion of Mermac's attorney, Daniel Kossow.[18] Murray's deposition description of the purpose and effect of the October 25, 1973 letter (referred to as "Exhibit 1" at the deposition) is enlightening:

Q. "Was it your understanding, Mr. Murray, that Exhibit 1 authorized you to do something?"

A. "Yes."

Q. "What was your understanding of what Exhibit 1 authorized you or MerMac to do?"

A. "To proceed with the development of a program utilizing the characters of Laurel and Hardy."

16. Tr. 9.

17. Ex. G to Silberberg affidavit.

18. Tr. 26–28.

Q. "Utilizing Chuck McCann to portray Oliver Hardy and Jim MacGeorge to portray Stan Laurel?"

A. "That was a prerequisite of Feiner in the letter.

Q. "And again I want to be sure of the sequence.

"At the time you received Exhibit 1 from Mr. Feiner, you had not yet begun production of the Stan 'n Ollie series?"

A. "In no way."

Q. "When did you begin production of that series, Mr. Murray?"

A. "It would be sometime after October 25th. I'm not sure of the date." Tr. 32–33.

When, following the October 25, 1973 letter, Murray began production of his Laurel and Hardy series, he entered into negotiations with co-defendant Worldvision, who agreed to advance $100,000 for production costs, and to act as distributor of the television series. A letter of agreement dated November 2, 1973 addressed by Worldvision to Mermac [19] reads in part as follows:

"MerMac Productions, Ltd.
146 East 49th Street
New York, New York 10017
Attn: Mr. Robert Murray
RE: LAUREL AND HARDY

Gentlemen:

The following when signed by you and us shall constitute our full and complete understanding with respect to the above captioned television series:

1. You represent and warrant that as a result of a grant to you from Richard Feiner and Company, Inc. you have the sole and exclusive right to produce a television series based upon the Hal Roach Studios, Inc., Laurel and Hardy motion picture comedy format. You further represent and warrant that as a result of the aforementioned grant you have the sole and exclusive right to draw upon approximately 100 Laurel and Hardy motion picture photoplays for this purpose. As a condition precedent to our obligations as set forth hereafter you will deliver to us copies of all underlying agreements relating to your aforesaid representations and warranties as well as a letter from your counsel as well as counsel for Robert Feiner and Company verifying the validity of the said rights.

2. Subject to our satisfaction with respect to the representations and warranties set forth in Paragraph 1 above and the conditions of Paragraph 3 below, we agree to advance to you a sum not to exceed $100,000.00 for the production of a one half hour color tape pilot, . . ."

Although this agreement was apparently never signed by Mermac and Worldvision, Worldvision advanced the $100,000 in production costs to Mermac as contemplated by the agreement; [20] and there is no reason to doubt that the quoted language accurately reflects the representations and warranties of authority made by Mermac to Worldvision.

Finally, the record contains a letter dated November 30, 1973 written to Kossow, the attorney for Mermac, by Michael Collyer, the attorney for Feiner. That letter reads in its entirety:

"Daniel Kossow, Esq.
Becker & London
15 Columbus Circle
New York, New York
Re: Richard Feiner & Company, Inc./Hal Roach Studios, Inc.

Dear Dan:

You have on behalf of Mermack Productions inquired as to the proprietary rights of our client, Richard Feiner and Company, Inc., in and to the well-known film characters Laurel & Hardy.

Please be advised that Richard Feiner and Company, Inc. acquired the characters, format and characterization rights in and to Laurel & Hardy from the Hal Roach Studios, Inc. by agreement dated May 1, 1969. Hal Roach Studios, Inc. is the creator of the Laurel & Hardy films and copyright proprietor with respect

---

**19.** Ex. H to Silberberg affidavit.

**20.** Murray, Tr. 37–38.

thereto. I am enclosing herewith a xerox copy of an undated notice from Hal Roach Studios, Inc. confirming these rights.

Should you require further confirmation, please contact Herbert Gelbspan, Executive Vice President of Hal Roach Studios, Inc. at Ci–5–4135.

Cordially,

s/ Michael Collyer

Michael Collyer

The enclosed confirmation from Hal Roach Studios, Inc., referred to in this letter, is a two-page document reciting that, on May 1, 1969, Roach granted to Feiner a wide collection of "merchandising, novelty and commercial rights", including but not limited to:

"(a) Utilize excerpts from the film footage, the sound tracks, all of the still photographs, and any and all other elements of the Laurel and Hardy copyrighted motion picture photoplays;

"(b) Make and/or remake—to produce and/or reproduce—to create and/or recreate—in any shape, form, matter or format including, audio, visual, still, live, tape, film, records and/or recordings, silent and/or sound motion pictures—publications, exhibitions and/or presentations—of the—impersonation, imitation, impression, characterization of Laurel and Hardy—and to—caricature, portray, cartoon, animate in any shape, form, matter or format Laurel and Hardy together with the right in and to:

"(c) The LAUREL AND HARDY names, likeness, characters, attitudes, situations, forms, ideas, movements, transitions, gestures, motions, impressions, voices, appearances and costumes, together with the comedy, humor, pathos, routines, material, situations and formats of Laurel and Hardy as created, recorded and copyrighted by; Hal Roach Studios, Inc., and/or with Hal E. Roach acting for same:

"FOR THE PURPOSE OF; distributing, sub-distributing, licensing, sub-licensing, franchising and/or selling the—

"RIGHTS AND PRIVILEGES of Paragraphs (a), (b) and (c), on the preceding page, with respect to the rights to:

"Exhibit in television, television commercials, radio, radio commercials, broadcasting, and all other forms of exhibition for theatrical and nontheatrical exhibition . . . ." [21]

As a result of these facts, the Court holds certain truths to be self-evident. When Murray's thought processes inclined him toward a television series based upon the Laurel and Hardy characters, he conferred with Feiner because he understood from McCann that Feiner, through Roach, had the right of approval. Feiner was willing to bestow certain rights he believed he had upon Mermac. Upon the insistence of his counsel, Murray obtained the October 25, 1973 letter from Feiner spelling out what rights Feiner was bestowing:

"the right to produce a television series based upon the Hal Roach Studios, Inc. Laurel and Hardy Motion picture comedy format including the rights to draw upon" the copyrighted movies."

Murray understood that this letter authorized Mermac "to proceed with the development of a program utilizing the characters of Laurel and Hardy." That is precisely what Murray set out to do. And when Murray involved Worldvision in the project, the underlying facts surface again. In its November 2, 1973 letter Worldvision reminds Mermac of the latter's representation and warranty that "as a result of a grant to you from Richard Feiner and Company, Inc. you have the sole and exclusive right to produce a television series based upon the Hal Roach Studios, Inc. Laurel and Hardy motion picture comedy format." Worldvision also refers, in that letter, to Mermac's further representation that "as a result of the aforementioned grant you have the sole and exclusive right" to draw upon the copyrighted Laurel and Hardy movies. Lastly, at the end of November, 1973 Mermac's attorney Kossow, presumably for some ad-

---

21. These documents appear as Ex. I to the Silberberg affidavit.

ditional corporate use, sought and obtained from Feiner's counsel a further written confirmation that Feiner had acquired "the characters, format and characterization rights in and to Laurel and Hardy from the Hal Roach Studios, Inc. . . ."

In the light of this evidence, Murray simply cannot be heard to argue, as he does in his affidavit of November 9, 1977 (p. 1):

"Contrary to the assertions contained in the moving papers, there was no relationship between Feiner and MerMac with the sole exception of a license to use film footage of the copyrighted Laurel and Hardy episodes produced by Roach. MerMac did not seek nor did it acquire from Feiner the right to employ in the pilot the likeness of Laurel and Hardy."

Mermac not only specifically requested from Feiner the right to employ the likenesses of Laurel and Hardy in a television series, it proclaimed the receipt from Feiner of that right to others, in furtherance of the project.

With Lewis Carroll, we may say of Murray: "What I tell you three times is true." [22] Mermac viewed its rights to go forward with a Laurel and Hardy television series as having been derived from Feiner, and from nowhere else.

The defendants' efforts to limit their entitlement from Feiner to use of film footage from the Laurel and Hardy movies produced by Roach fly in the face of the contemporaneous evidence, and are entirely unpersuasive. It is clear from the plain language of the letters of agreement being exchanged at the time that Mermac's primary objective was to obtain from Feiner the right to produce a television series based upon the Laurel and Hardy characters; use of the copyrighted movies, further agreed to by Feiner, was obviously incidental to, and in aid of, that primary object. The wealth of evidence demonstrating the lack of substance of Murray's subsequent disclaimers need not be reiterated. We might inquire, however, that if it was the fact that, following Murray's affidavit, "MerMac did not seek nor did it acquire

from Feiner the right to employ in the pilot the likeness of Laurel and Hardy", how are we to explain the presence in Feiner's October 25, 1973 letter to Mermac the recitation of the agreement, between the two companies, that Mermac "is to be the producing or co-producing facility and shall include the right for Chuck McCann to portray Oliver Hardy and Jim MacGeorge to portray Stan Laurel"?

In their effort to demonstrate a genuine issue of fact concerning the scope of the Roach-Feiner conveyance of rights, the defendants rely upon this testimony that Murray gave in his deposition, concerning his conversation with Feiner:

"The thing was, in talking about rights, the reference was only always made to films that Hal Roach had owned in these documents here, the underlying documents, that gave Feiner the rights, so what I am saying is, in my conversations I always had the understanding for the utilization of remaking films, if you will, working off the film rights." Tr. 24.

Just what point the witness was attempting to make in this testimony is not entirely clear. Viewing the testimony in the light most favorable to defendants, Murray may be saying that the "underlying" Roach documents, upon which Feiner's rights were posited, were limited to use of the copyrighted film. But such an assertion is flatly contradicted by Roach's bestowal of rights upon Feiner, forwarded to Mermac's counsel as an enclosure to the Collyer letter of November 30, 1973. That Roach declaration, quoted at p. 263 *supra*, by its plain words extends far beyond the utilization of the copyrighted films.

I conclude, in short, that no genuine triable issue of fact exists with respect to the contemporaneous perception of Mermac and Worldvision as to the source of their authority to produce and distribute a Laurel and Hardy television series. That source of authority was Mermac's agreement with Feiner.

22. *The Hunting of the Snark.*

██ I recognize that where the affidavit of a party opposing summary judgment differs from, or varies his evidence as given by deposition, the conflict may disclose an issue of credibility requiring trial. 6 Moore's *Federal Practice* (2d ed. 1976) at ¶ 56.15[4], p. 56–522. Moore also reminds us, however, that the opposing party's facts "must be material and of a substantial nature, not fanciful, frivolous, gauzy, spurious, irrelevant, gossamer inferences, conjectural, speculative, nor merely suspicious." *Id.* at ¶ 56.15[3], at pp. 56–486, 487. In the case at bar, Murray's affidavits in opposition to the summary judgment motion are not so much factual, giving rise to possible credibility issues, as conclusory; and the conclusions sought to be drawn fly in the face of the facts, as demonstrated by his deposition and the contemporaneous documents. For example, at p. 3 of his affidavit of November 9, 1977 the following is said in aid of defendants' effort to limit the Feiner agreement to the use of the copyrighted films:

"I thought it would be desirable to occasionally include footage of Laurel and Hardy motion pictures owned by Hal Roach. This footage would be otherwise helpful in that it could suggest to us ideas for situtations [sic] that could be developed and made contemporary for various episodes in the series. To employ this film footage I sought authorization from Roach through his representative Feiner. I emphatically deny that I dealt with Feiner for any other purpose and nothing in my deposition suggests the contrary. *I believed then as I do today that the right to employ actors in the style of Laurel and Hardy is a right that is the exclusive property of no one.* In other words, as respects the material in issue here I do not claim through Roach or Feiner." (emphasis added).

This is really argument, not factual recitations; and Murray's belief, underlying the argument, is without legal foundation, in the light of Judge Stewart's legal conclusion in the *Roach* opinion.

██ Defendants make one additional argument with respect to these sources of their authority. That argument is without merit, and requires little discussion. It is introduced in Murray's affidavit, at p. 2:

"Another significant respect in which the issues in the instant proceedings differ from those in the 'Roach-Feiner Case' is that the actors who assumed the lead roles in 'Stan 'n Ollie' had, I am informed, received express permission to do just that from Stan Laurel himself, acting on behalf of himself and the deceased Oliver Hardy."

In support of this understanding on Murray's part, a series of envelopes and letters are attached to the Murray affidavit.[23] These reflect a correspondence between Stan Laurel and the actor, Chuck McCann, extending from August 2, 1960 through February 14, 1964. Laurel and McCann were obviously close friends. The correspondence consists, for the most part, of McCann's detailed, affectionate accounts to Laurel of McCann's recent activities, and Laurel's equally friendly, if more terse, responses. Some of the letters have nothing to do with a request for authority by McCann or a grant of authority by Laurel. It is true that certain of the letters (Ex. D, E) may be read as expressions of Laurel's consent that McCann use Laurel and Hardy puppets on television, or that McCann portray Hardy (referred to as "Babe") in sketches on television shows. Again, however, drawing the most favorable inferences to defendants from this correspondence, there is nothing whatsoever to indicate that Laurel was "acting on behalf of himself *and the deceased Oliver Hardy*", as recited in the Murray affidavit. Nor is there the slightest evidence that Laurel was authorized to act on behalf of Hardy's estate. Hardy died on August 7, 1957.[24] Judge Stewart found in *Roach* that plaintiff Price was the widow and sole beneficiary of Hardy's estate. 400 F.Supp. at 838. It was Mrs. Price who, on behalf of the Hardy estate, entered into the agreement of March 21, 1961 with

---

**23.** Ex. D. through I.

**24.** See Ex. A to Murray affidavit.

plaintiff Harmon, as also referred to by Judge Stewart in *Roach*. *Ibid*. The present defendants' contention of authority for the "Stan 'n Ollie" series, allegedly deriving from the McCann-Laurel correspondence, is patently insufficient in law, and no genuine issues of fact arise from that correspondence.[25]

I conclude that no genuine issue of fact exists to be tried with respect to the source of the authority pursuant to which defendants purported to act. Defendants, in undertaking to produce and distribute the Stan 'n Ollie series, were relying solely upon rights which they believed they had obtained from Feiner, and through Feiner from Roach. The present defendants are thus in privity with the defendants in the *Roach* case, in which precisely those rights as asserted by Roach and Feiner were held not to exist.

### IV.

Defendants assert one final triable issue of fact, namely, whether the awareness of the plaintiffs or their predecessors in interest of prior portrayals of Laurel and Hardy by McCann, MacGeorge, or others give rise to defenses based upon estoppel, waiver, or "practical construction of the rights granted them by Laurel and Hardy."[26]

For the reasons stated above, I conclude that the doctrine of *res judicata* is applicable to this case. In consequence, the present defendants are not entitled in law to assert these defenses. The Second Circuit has recently said, in *Ornstein v. Regan*, 574 F.2d 115 (1978):

"The traditional doctrine of *res judicata* is that a valid final judgment on the merits operates to bind the parties both as to issues actually litigated and determined in the first action and as to those issues which might have been, but were not, actually raised and decided in that first action. *Saylor v. Lindsley*, 391 F.2d 965, 968 (2d Cir. 1968)." At 117.

It is clear from the evidence on this motion that McCann regarded his source of authority for such activities as Feiner and Roach. (see p. 260 *supra*). Furthermore, Feiner was well aware of McCann's television activities.[27] Roach and Feiner, the defendants in *Roach*, were well aware of McCann's television activities relating to Laurel and Hardy. They could have asserted such defenses of estoppel or waiver and did not; the present defendants, who are in privity with them, are bound by the omission.[28]

### CONCLUSION

Under the doctrine of *res judicata*, the plaintiffs are entitled to summary judgment granting them relief against the present defendants comparable to that awarded in *Price v. Hal Roach Studios, Inc.*, 400 F.Supp. 836 (S.D.N.Y.1975). A permanent injunction will issue, following the format of the injunction issued in *Roach*. As in *Roach*, the appropriate amount of actual damages will be determined upon submission of briefs and a hearing; although, in light of the apparent non-use of the "Stan 'n Ollie" pilot program, such questions may not in fact arise.

Settle decree in accordance with this opinion on five (5) days' notice.

It is So Ordered.

25. Plaintiffs point out correctly that this aspect of the Murray affidavit is hearsay, and the letters in question are not properly authenticated. Thus this material is not entitled to consideration on the motion for summary judgment. Rule 56(e), F.R.Civ.P. I prefer, however, to dispose of the argument on the merits. Not only does the defense lack merit in law, in view of the contemporaneous documents exchanged between Mermac and others it is obvious that Mermac regarded the Roach-Feiner agreements as its sole source of authority to produce the series. Issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is "too incredible to be believed by reasonable minds." *Moore*, op. cit. *supra*, at ' 56.15[4], p. 56–524.

26. Defendants' Rule 9(g) statement at ' 4.

27. Supplementary affidavit of Michael Silberberg, verified December 12, 1977, and deposition of Feiner in *Roach* suit at p. 92.

28. The *Roach* defendants put forward other waiver arguments, somewhat comparable, which Judge Stewart rejected. 400 F.Supp. at 842, 846–847.