14 F.3d 912
 29 U.S.P.Q.2d 1586, 22 Media L. Rep. 1205
 Doris McFARLAND, in her capacity as personal representative
of the Estate of George "Spanky" McFarland,
Appellant (per Court's 9/21/93 Order)
v.
Joseph MILLER, an individual; Andaconda, Inc., t/a Spanky
McFarland's, a New Jersey corporation; Strawberry
Fields, Inc., a New Jersey corporation.
 No. 92-5177.
 United States Court of Appeals,
Third Circuit.
 Argued Feb. 23, 1993.
Decided Jan. 25, 1994.
 
 Angelo G. Garubo, Hochberg, Krieger, Danzig & Garubo, Roseland, NJ, Marshall H. Tanick (argued) Mansfield & Tanick, P.A., Minneapolis, MN, for appellant.
 Bernard M. Reilly (argued) Dowd & Reilly, Red Bank, NJ, for appellees Joseph Miller, an individual, and Anaconda, Inc. t/a Spanky McFarland's, a New Jersey corporation.
 Present: HUTCHINSON and ALITO, Circuit Judges, FULLAM, District Judge*
 OPINION OF THE COURT
 HUTCHINSON, Circuit Judge.
 
 
 1
 Appellant Doris McFarland, personal representative of George "Spanky" McFarland ("McFarland"), now deceased,[1] appeals orders of the United States District Court for the District of New Jersey on cross-motions for summary judgment. On those motions, the district court granted summary judgment to appellees Joseph Miller ("Miller") and Anaconda, Inc. ("Anaconda")[2], dismissing all of McFarland's claims against them, and denied McFarland's cross-motion for summary judgment as to liability. We have appellate jurisdiction over these final orders of the district court. See 28 U.S.C.A. Sec. 1291 (West 1993). The district court had subject matter jurisdiction under 28 U.S.C.A. Sec. 1332 (West 1993) (providing for subject matter jurisdiction based on diversity of citizenship) and under 28 U.S.C.A. Sec. 1331 (West 1993) because the case presented a federal question arising under the Lanham Act, 15 U.S.C.A. Sec. 1125(a) (West Supp.1993).
 
 
 2
 McFarland was once a child actor in the "Our Gang" series, a popular short subject comedy series shown in movie theaters from the 1920s to the 1940s, thereafter on television, and later revived under the name of the "Little Rascals." In the series, McFarland played a lovable but mischievous urchin under the nickname "Spanky." He filed this action challenging the use, without his authorization, of the name Spanky McFarland by a restaurant located in Ocean Township, New Jersey, owned by Anaconda and operated by Miller. This restaurant also utilized McFarland's image as it appeared in his "Our Gang" days. McFarland contends that the district court erred in granting Miller and Anaconda's motion for summary judgment solely because Hal Roach Studios, Inc. (the "Studio"), the producer of the "Our Gang" movie series, or its successor, was the owner of whatever rights McFarland had to the name "Spanky McFarland" under a 1936 contract between McFarland's parents, acting on his behalf, and the Studio.
 
 
 3
 Because McFarland died while his appeal was pending, we must decide initially whether a person's right to prevent unauthorized commercial use of a name survives the person's death under New Jersey law. If it does, we must determine whether McFarland received or retained any right to commercial use of the name "Spanky McFarland" that would give him standing to bring an action for unauthorized commercial use of that name. We apply New Jersey law to the question of unauthorized commercial use because the alleged unauthorized use occurred in New Jersey, the parties do not suggest application of the law of any other forum, and our own research indicates a New Jersey court would apply New Jersey law to the question of unauthorized use.
 
 
 4
 After considering the issues, we conclude that infringement of a person's right to exploit commercially his own name or the name of a character so associated with him that it identifies him in his own right is a cause of action that under New Jersey law survives the death of the person with whom the name has become identified. Therefore, we hold that McFarland's action to prevent unauthorized use of the name "Spanky McFarland" survived his death and passed to his personal representative, Doris McFarland. We also hold that there is evidence on this record which shows that the name Spanky McFarland has become so identified with McFarland that it could be considered his own name or the name of a character so associated with him as to be indistinguishable from him in public perception. Finally, we hold that the district court erred in concluding that the 1936 contract with the studio deprived McFarland of all standing to enforce his right of publicity in the name Spanky McFarland. Thus, if McFarland's personal representatives can demonstrate on remand that the name Spanky McFarland identified George McFarland and not just the little urchin Spanky he portrayed in the movie and television series, McFarland's right of publicity to exploit the name Spanky McFarland is superior to that of Miller and Anaconda. We will, therefore, remand this case to the district court in order to determine whether McFarland is inextricably linked to the name and image of Spanky McFarland.
 
 
 5
 Our reasons follow.
 
 I.
 
 6
 In 1931, at the age of three, George McFarland joined "Our Gang" (later known as the "Little Rascals"), a theatrical group of mischievous children whose adventures were chronicled in a number of movie short films, known as serials, in the 1920s, 30s, and 40s.[3] The "Gang" was a creation of the legendary Hollywood producer Hal Roach.
 
 
 7
 Initially, McFarland was hired to portray an unnamed small child in the group. Before his first appearance, a newspaper reporter dubbed McFarland "Spanky." The producer picked up on this nickname and the "Our Gang" series then used "Spanky" as the name of the character McFarland played. The nickname "Spanky" remained identified with McFarland throughout his movie career. See Leonard Maltin & Richard Bann, The Little Rascals: The Life and Times of Our Gang 118 (1992).
 
 
 8
 In 1931, McFarland entered into a five-year agreement with the Studio governing his employment ("1931 contract"). Shortly after the 1931 contract was signed, McFarland made his first appearance in the series, entitled "Free Eats." McFarland was a featured performer in his second film in the series, entitled "Spanky." He would eventually appear as Spanky in a total of ninety-five "Our Gang" films from 1937 through 1942.[4]
 
 
 9
 In 1936, McFarland's initial contract expired and, through his parents, he entered into a new agreement ("1936 contract") with the Studio. The agreement was similar to those entered into by other studio employees, see Price v. Hal Roach, Studios, Inc., 400 F.Supp. 836, 839-43 (S.D.N.Y.1975) (construing similar contract between comic team of Laurel and Hardy and Studio). It provided McFarland would continue to appear as a member of the Gang in return for $250 a week during filming and $25.00 a week in "suspension time."[5]
 
 
 10
 In 1938, the Studio sold the entire "Our Gang" series, directors, writers, talent contracts and all, to Loew's Inc., (a/k/a Metro-Goldwyn-Mayer). McFarland renegotiated his contract in 1938 and remained with the Gang until 1942. M-G-M subsequently assigned the rights to the Little Rascals to King World Productions. In 1987, Turner Entertainment Company purchased M-G-M properties and now jointly licenses Our Gang/Little Rascals merchandise with King World.
 
 
 11
 Sadly, George McFarland passed away during the pendency of this appeal at the age of sixty-four. At the time of his death, he was still receiving income from the licensing of his name "Spanky" and from various commercial ventures under the name "Spanky McFarland."[6]
 
 
 12
 Miller is the principal shareholder and president of Anaconda. Anaconda leases a facility at 821 West Park Avenue in Ocean Township, New Jersey known as "Spanky McFarland's" (the "Restaurant"). Anaconda also holds the liquor license for the establishment.
 
 
 13
 On July 31, 1989, the restaurant opened for business. In a deposition, Miller admitted he was solely responsible for choosing Spanky McFarland's as the name for his restaurant. He claimed he picked the name "McFarland" because it sounded Irish and "Spanky" was a nickname he once used for his son.[7] He also admitted he was aware that the restaurant shared the name of an "Our Gang" character. In the restaurant, Miller has over 1,000 photos of movie characters including some of the "Little Rascals." The restaurant also displays two four-by-six-foot murals of "Our Gang." They include McFarland. Furthermore, the establishment's menu makes numerous references to the characters.[8] McFarland never consented to the restaurant's use of his name or likeness.
 
 
 14
 On September 17, 1990, McFarland began this action for injunctive relief and damages on claims based upon the right of publicity; common law invasion of privacy; unjust enrichment; the Lanham Act, 15 U.S.C.A. Sec. 1125 (West 1982 & Supp.1993); and the New Jersey Consumer Fraud Act, N.J.Stat.Ann. Sec. 56:8-1 to 2 (West 1979). After limited discovery, the parties filed cross-motions for summary judgment. On January 6, 1992, the district court denied McFarland's motion and granted Miller's on all counts. It reasoned whatever right George McFarland ever had to exploit the name Spanky McFarland passed to the Studio in 1936.
 
 
 15
 An analysis of the contract ... clearly indicates that plaintiff has no right to the character of Spanky McFarland other than the right to use the nickname Spanky.... The style may be somewhat archaic, but the contract's import is clear. By executing it, plaintiff relinquished all rights he had to the name and image of the Spanky character.
 
 
 16
 McFarland v. Miller, No. 90-3779, slip op. at 3-4, 1992 WL 4967, * 2, 1992 U.S. Dist. LEXIS 150, * 4-5 (D.N.J.1992).
 
 
 17
 McFarland made a motion for reconsideration and included with it as exhibits a number of subsequent contracts between himself and other parties in an effort to demonstrate that the parties to the 1936 contract understood it differently than the court. The district court denied the motion for reconsideration on March 2, 1992. It refused to consider the additional material because McFarland did not comply with district court General Rule 12I. That local rule requires all motions for reconsideration to be accompanied by a memo setting forth the items and principles the parties believe the court has overlooked.
 
 
 18
 On March 30, 1992, McFarland filed a timely notice of appeal challenging both the grant of summary judgment against him and the district court's denial of his motion for summary judgment.[9]II.
 
 
 19
 In reviewing an order granting or denying a motion for summary judgment, "the appellate court is required to apply the same test the district court should have utilized...." Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir.1976), cert. denied, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Generally, an order denying a motion for summary judgment is not appealable; however, it becomes so "when accompanied by an order granting a cross motion for summary judgment." Stroehmann Bakeries, Inc. v. Local 776, Int'l Bhd. of Teamsters, 969 F.2d 1436, 1440 (3d Cir.) (citation omitted), cert. denied, --- U.S. ----, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992). This Court exercises plenary review over the grant or denial of such motions and "appl[ies] the same test the district court applied: (1) are there no material facts in dispute; and (2) is one party entitled to judgment as a matter of law?" Id. at 1441; see also Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Inv., 951 F.2d 1399, 1404 (3d Cir.1991). These inquiries are designed to determine whether a "genuine issue" of "material fact" exists. Fed.R.Civ.P. 56(c). A genuine issue is defined as an issue on which "a reasonable [fact finder] could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).
 
 
 20
 A federal court sitting in diversity is bound to apply the choice of law rules of the forum state. Van Dusen v. Barrack, 376 U.S. 612, 644-46, 84 S.Ct. 805, 823-24, 11 L.Ed.2d 945 (1964); Shields v. Consolidated Rail Corp., 810 F.2d 397, 399 (3d Cir.1987). New Jersey applies a governmental interest test to resolve choice of law issues. Veazey v. Doremus, 103 N.J. 244, 510 A.2d 1187, 1189 (1986). We have held the governmental interest test involves a two-part analysis. Henry v. Richardson-Merrell, Inc., 508 F.2d 28, 32 (3d Cir.1975). "The court determines first the governmental policies evidenced by the laws of the related jurisdiction and second the factual contacts between the parties and each related jurisdiction." Id. This approach is primarily concerned with the "qualitative nature of the contacts" rather than the number of them because New Jersey places primary emphasis on those facts which relate to the governmental interest. Id.
 
 
 21
 In New Jersey, McFarland's claim to a right of publicity sounds in tort. To the extent McFarland seeks to recover in tort for injury in the state of New Jersey, we will apply New Jersey law.
 
 III.
 
 22
 Lamentably, as mentioned supra, George McFarland passed away while we entertained this appeal. We are thus first required to consider whether an infringement of a decedent's right of publicity in his name or image creates a cause of action that survives his death under New Jersey law so that the personal representative of a public figure may assert or continue an action to enforce that right.
 
 
 23
 At first glance, it would seem that we have before us the same issue that was decided in Estate of Presley v. Russen, 513 F.Supp. 1339 (D.N.J.1981). There, the court concluded that the common law right of publicity is descendible under New Jersey law. Presley, 513 F.Supp. at 1355. The issue in Presley was whether the estate of Elvis Presley could assert the late singer's right of publicity in New Jersey to enjoin the performance of a stage show in New Jersey employing Presley imitators. Id. Our case presents a slightly different aspect of that issue because the infringement here took place during McFarland's lifetime.
 
 
 24
 The New Jersey statute governing the survival of civil actions provides in relevant part,
 
 
 25
 Executors and administrators may have an action for any trespass done to the person or property, real or personal, of their testator or intestate against the trespasser, and recover their damages as their testator or intestate would have had if he was living.
 
 
 26
 N.J.Stat.Ann. Sec. 2A:15-3 (West 1987). In New Jersey, the right of publicity is a property right. Presley, 513 F.Supp. at 1355; Canessa v. J.I. Kislak, Inc., 235 A.2d 62, 76 (N.J.Super.1967); cf. Piscopo v. Piscopo, 232 N.J.Super. 559, 557 A.2d 1040, 1042-43 (celebrity good will is marital property), cert. denied, 117 N.J. 156, 564 A.2d 875 (1989). But see Palmer v. Schonhorn Enters., Inc., 96 N.J.Super. 72, 232 A.2d 458 (1967) (failing to characterize right as one of property). Certainly if McFarland had a proprietary interest in the name Spanky McFarland, an action for its misappropriation would survive and give McFarland's personal representative the same right to recover damages and prevent continuing interference with that right that McFarland had while living.
 
 
 27
 Two New Jersey defamation cases support this conclusion. In Fasching v. Kallinger, 211 N.J.Super. 26, 510 A.2d 694, 700-01 (1986), the court had held that neither the dead nor their relatives had any cause of action for defamation because defamation inflicts a harm that is personal to the individual. In Canino v. New York News, Inc., 96 N.J. 189, 475 A.2d 528 (1984), however, the New Jersey Supreme Court read that state's act to permit a cause of action for defamation where the claim arose out of acts that occurred before the death of the person defamed. Rejecting the common law maxim actio personalis moritur cum persona,[10] the court held that where the cause of action accrues during the lifetime of the individual, the personal representative could continue the defamation action. Id. at 529-32.
 
 
 28
 We think McFarland's action is a trespass within the ambit of N.J.Stat.Ann. Sec. 2A:15-3's abrogation of the common law rule against survival. If the defamation action survives, the publicity action does so a fortiori because the right of publicity has become largely proprietary, not personal as in defamation. McFarland's claims did not abate on his death and his personal representative has the right to continue this action. We must therefore consider it on the merits.
 
 IV.
 
 29
 The district court held, in essence, that George McFarland had an extremely limited interest in exploitation of his childhood image or the name Spanky McFarland because Spanky was merely a character whom McFarland was employed to play. That holding naturally implied that the character belonged to some entity other than McFarland. That other party, the court concluded, was the Studio or its successors in interest. The court based that holding on its construction of the 1936 contract. Specifically, it determined that the 1936 contract did not show that the parties believed McFarland's name was "Spanky," nor did it convey to McFarland any right to exploit either the name and image of the character Spanky, aside from using the name in personal appearances, or the right to prevent others from doing so. The law in this area has been likened to a "haystack in a hurricane." See Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, 485 (3d Cir.), cert. denied, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956). Still, we think the district court grasped the wrong bundle when it concluded that McFarland had no interest in the exploitation of the image or name Spanky McFarland.
 
 
 30
 The "right of publicity" "signif[ies] the right of an individual, especially a public figure or a celebrity, to control the commercial value and exploitation of his name and picture or likeness and to prevent others from unfairly appropriating this value for commercial benefit." Presley, 513 F.Supp. at 1353 (footnote omitted); see also Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 573, 97 S.Ct. 2849, 2856, 53 L.Ed.2d 965 (1977) (identifying right of publicity as proprietary interest in performer's actions); Haelan Lab., Inc. v. Topps Chewing Gum, Inc., 202 F.2d 866, 868 (2d Cir.) (recognizing common law right in publicity), cert. denied, 346 U.S. 816, 74 S.Ct. 26, 98 L.Ed. 343 (1953); Lugosi v. Universal Pictures, 25 Cal.3d 813, 160 Cal.Rptr. 323, 329, 603 P.2d 425, 431 (1979) (in banc) ("The so-called right of publicity means in essence that the reaction of the public to name and likeness, which may be fortuitous or which may be managed or planned, endows the name and likeness of the person involved with commercially exploitable opportunities."); Sheldon W. Halpern, The Right of Publicity, Commercial Exploitation of the Associative Value of Personality, 39 Vand.L.Rev. 1199, 1201 (1986).
 
 
 31
 Federal courts first recognized the right of publicity in Haelan Laboratories. There, with words still trenchant today, the court observed "that many prominent persons (especially actors and ball players), far from having their feelings bruised through public exposure of their likenesses, would feel sorely deprived if they no longer received money for authorizing advertisements, popularizing their countenances, displayed in newspapers, magazines, buses, trains and subways." Haelan Lab., 202 F.2d at 868. The New Jersey courts have recognized a similar right of exploitation.
 
 
 32
 [A]lthough the publication of biographical data of a well known figure does not per se constitute an invasion of privacy, the use of the same data for the purpose of capitalizing upon the name by using it in connection with a commercial project other than the dissemination of news or articles or biographies does. The names of plaintiffs have become internationally famous, undoubtedly by reason of talent as well as hard work in perfecting it. This is probably true in the cases of most so-called celebrities.... Perhaps the basic and underlying theory is that a person has the right to enjoy the fruits of his own industry free from unjustified interference. It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have been highly publicized.
 
 
 33
 Palmer, 232 A.2d at 462 (citations omitted) (granting recovery against unauthorized use of professional golfers' names and vital statistics in golf game).[11] A famous individual's name, likeness, and endorsement carry value and an unauthorized use harms the person both by diluting the value of the name and depriving that individual of compensation. Unauthorized use of an individual's name is nothing short of "an appropriation of the attributes of one's identity." Motschenbacher v. R.J. Reynolds Tobacco Co., 498 F.2d 821, 824 (9th Cir.1974).
 
 
 34
 The district court held, in effect, that an actor who portrays a character in such a manner that the character becomes inextricably intertwined with the individual, to such an extent that the individual comes to utilize the character's name as his own, has no proprietary interest in the exploitation of the name or image. We disagree. At its heart, the value of the right of publicity is associational. People link the person with the items the person endorses and, if that person is famous, that link has value. Celebrities' names and likenesses "are things of value. Defendant has made them so, for it has taken them for its own commercial benefit." Canessa, 235 A.2d at 76.
 
 
 35
 Other courts have concluded that the value of the right of publicity lies in the association between celebrity and product. For example, in White v. Samsung Electronics America, Inc., 971 F.2d 1395 (9th Cir.1992), cert. denied, --- U.S. ----, 113 S.Ct. 2443, 124 L.Ed.2d 660 (1993), the United States Court of Appeals for the Ninth Circuit considered whether an appliance manufacturer that showed a nattily adorned, unnamed robot standing in front of a board of letters infringed on the publicity rights of Wheel of Fortune persona Vanna White. Id. at 1396. White argued on appeal because the robot resembled her, albeit farcically, and was obviously used to invoke images of her, that her right of publicity had been infringed. The court of appeals agreed and reversed an order granting summary judgment to Samsung. Id. at 1399. Although White did not own the show that created the association, the court held that she possessed the image invoked and this raised a triable issue as to infringement. Id.; cf. White v. Samsung Elecs. Am., Inc., 989 F.2d 1512, 1515 (9th Cir.1993) (Kozinski, J., dissenting from denial of petition for rehearing in banc) ("It's the 'Wheel of Fortune' set, not the robot's face or dress or jewelry that evokes White's image.").
 
 
 36
 Another somewhat offensive example is seen in Carson v. Here's Johnny Portable Toilets, 698 F.2d 831 (6th Cir.1983). There, late-night entertainer Johnny Carson sought a remedy for unauthorized use of the introductory phrase "Here's Johnny" in the marketing of a portable toilet. This phrase was used to announce his entrance on the Tonight Show even though Carson himself never actually used the phrase. Rejecting the contention that a common law right of publicity does not extend beyond an individual's actual name and likeness, the United States Court of Appeals for the Sixth Circuit stated:
 
 
 37
 It is our view that, under the existing authorities, a celebrity's legal right of publicity is invaded whenever his identity is intentionally appropriated for commercial purposes.... It is not fatal to appellant's claim that appellee did not use his "name." Indeed, there would have been no violation of his right of publicity even if appellee had used his name, such as "J. William Carson Portable Toilet" or the "John William Carson Portable Toilet" or the "J.W. Carson Portable Toilet." The reason is that, though literally using appellant's "name," the appellee would not have appropriated Carson's identity as a celebrity. Here there was an appropriation of Carson's identity without using his "name."
 
 
 38
 Id. at 837.
 
 
 39
 Both of these decisions recognize that without identification, the right of publicity is worthless. Here, we are presented with two subtly different questions: Was there an identification of George McFarland with the character Spanky and, if so, does a right of publicity follow and vest in the performer with whom the character has become identified?
 
 
 40
 The district court saw this case as one in which George McFarland had been an actor playing the role of Spanky in the course of an employment relationship with the Studio that produced "Our Gang."[12] Where an actor plays a well-defined part which has not become inextricably identified with his own person, it has been suggested the actor receives no right of exploitation in his portrayal of the character. See Lugosi, 160 Cal.Rptr. at 330, 603 P.2d at 432 (Mosk, J., concurring) ("Merely playing a role [such as Bela Lugosi as Dracula] ... creates no inheritable property right in an actor, absent a contract so providing."). But see id. at 344, 603 P.2d at 444 (Bird, C.J., dissenting) ("Substantial publicity value exists in the likeness of [famous actors] in their character roles. The professional and economic interests in controlling the commercial exploitation of their likenesses while portraying these characters are identical to their interest in controlling the use of their own 'natural' likeness.").[13]
 
 
 41
 In his concurrence in Lugosi, Justice Mosk recognized another distinct situation where the actor could obtain proprietary interests in a screen persona: "An original creation of a fictional figure played exclusively by its creator may well be protectible." Id. at 330, 603 P.2d at 432 (Mosk, J., concurring).[14] We are inclined to agree, but we think the difference between the two situations Justice Mosk contrasts is not wholly dependent on originality as his concurrence suggests. While originality plays a role, a court should also consider the association with the real life actor. Where an actor's screen persona becomes so associated with him that it becomes inseparable from the actor's own public image, the actor obtains an interest in the image which gives him standing to prevent mere interlopers from using it without authority.[15] This principle may be seen in a number of other cases. See, e.g., Allen v. Men's World Outlet, Inc., 679 F.Supp. 360, 362, 371 (S.D.N.Y.1988) (enjoining look-alike's misappropriation of "schlemiel" persona of Woody Allen cultivated in the film Annie Hall ); Groucho Marx Prod. Inc. v. Day & Night Co., 523 F.Supp. 485, 491 (S.D.N.Y.1981) (Marx Brothers had protected right in on-screen images and actions), rev'd on other grounds, 689 F.2d 317 (2d Cir.1982); Price v. Hal Roach Studios, Inc., 400 F.Supp. 836, 843-44 (S.D.N.Y.1975) (comic duo Stan Laurel and Oliver Hardy had common law right of publicity in on-screen images). Much as the court observed in Price, "we deal here with actors portraying themselves and developing their own characters...." Price, 400 F.Supp. at 845. A misappropriation took place in Allen and Price because the performers were identified with the image developed on-screen. Thus, the actor who developed the image had the right to exploit it as superior to third parties which had nothing to do with the actor or the character identified with the actor.
 
 
 42
 In the current posture of this case, we do not have to decide whether Spanky McFarland was truly identical to George McFarland or whether Spanky was merely a character created by Hal Roach. Likewise, we do not have to determine whether McFarland had done a metamorphosis into Spanky McFarland over the years before or after the 1936 contract. The successor to the Studio is not before us. Therefore, we need not decide who would prevail in a contest between that entity and McFarland's estate. We hold only that there exists at least a triable issue of fact as to whether McFarland had become so inextricably identified with Spanky McFarland that McFarland's own identity would be invoked by the name Spanky. As the Wisconsin Supreme Court stated in Hirsch v. S.C. Johnson & Son, Inc., 90 Wis.2d 379, 280 N.W.2d 129, 137 (1979), "[a]ll that is required is that the name clearly identify the wronged person." Id. (holding that "Crazylegs Shaving Gel" infringes on the right of publicity of football great Elroy "Crazylegs" Hirsch). On the record now before us, there is evidence of identification between the name Spanky and the actor McFarland sufficient to show that he, and now his estate, have a right of publicity superior to that of the interloper, Miller, in exploiting the name and image of Spanky McFarland. Accordingly, summary judgment was inappropriate. While others may be able to claim that they were entirely responsible for the value of the name and image or, by assignment, own the right to exploit the publicity value of the name and image of Spanky McFarland, Miller has no such claim or defense. George McFarland has alleged facts sufficient to support a right superior to that of Miller or Anaconda to exploit the items that invoke his own image.
 
 
 43
 This result seems to us consistent with the New Jersey courts' view of the right of publicity. As far back as 1909, New Jersey recognized an individual's proprietary interest in the use of his or her name and appearance to endorse or sell a product. See Edison v. Edison Polyform Mfg. Co., 73 N.J.Eq. 136, 67 A. 392 (1909) (enjoining a third party from using the name or likeness of inventor Thomas Edison to promote its own products). We recognized that principle of New Jersey law in Ettore v. Philco Television Broadcasting Corp., 229 F.2d 481, 491-92 (3d Cir.), cert. denied, 351 U.S. 926, 76 S.Ct. 783, 100 L.Ed. 1456 (1956). In Palmer, the New Jersey Superior Court had before it an unauthorized use of certain professional golfers' names and biographical information. It held unauthorized use violated the athletes' rights to exploit their own image. See Palmer, 232 A.2d at 462 ("[T]he basic and underlying theory is that a person has the right to enjoy the fruits of his own industry free from unjustified interference."). In Canessa v. J.I. Kislak, Inc., 97 N.J.Super. 327, 235 A.2d 62 (1967), the court stated:Entirely apart, however, from the metaphysical niceties, the reality of a case such as we have here is, in the court's opinion, simply this: plaintiffs' names and likenesses belong to them. As such they are property. They are things of value. Defendant has made them so, for it has taken them for its own commercial benefit.... New Jersey has always enjoined the use of plaintiff's likeness and name on the specific basis that it was a protected property right. It is as much a property right after its wrongful use by defendant as it might be before such use.
 
 
 44
 Canessa, 235 A.2d at 76 (citations omitted).
 
 
 45
 When Miller appropriated the name Spanky McFarland and McFarland's likeness in pursuit of a commercial goal, McFarland became entitled to the same protection the New Jersey courts gave in Edison, Canessa, and Palmer. In Palmer the court observed, "It is unfair that one should be permitted to commercialize or exploit or capitalize upon another's name, reputation or accomplishments merely because the owner's accomplishments have become highly publicized." Palmer, 232 A.2d at 462. In taking McFarland's name, Miller unfairly sought to capitalize on its value. The very act of taking it for that purpose demonstrates the name itself has worth. See, e.g., Canessa, 235 A.2d at 75; see also Midler v. Ford Motor Co., 849 F.2d 460, 463 (9th Cir.1988). The right to publicity protects the value a performer's identity has because that identity has become entwined in the public mind with the name of the person it identifies. It is this value that Miller sought to use without authority or right. McFarland, not Miller, crafted the irrepressible persona of "Our Gang"'s Spanky. Spanky's image is not Miller's to exploit or convey. If McFarland can demonstrate his identification with the name "Spanky," we do not think New Jersey law would permit Miller to appropriate the nickname Spanky for his own commercial advantage without McFarland's consent, in the absence of a valid license or assignment from the true owner. See Canessa, 235 A.2d at 76 (" 'If there is value in it, sufficient to excite the cupidity of another, why is it not the property of him who gives it the value and from whom the value springs?' ") (quoting Munden v. Harris, 153 Mo.App. 652, 134 S.W. 1076, 1078 (Mo.Sup.Ct.1911)). The value of that right is what the market would pay to receive such an endorsement. Midler, 849 F.2d at 463.
 
 
 46
 The evidence Miller presented concerning his disclosure of his intended use to the successor to the Studio's rights on the 1936 contract and the absence of objection on its part do not help him. We do not believe, under the record presented on this motion for summary judgment, that the 1936 contract as written could divest McFarland of all proprietary interest in the exploitation of his own name, assuming McFarland establishes the connection between the name utilized by Miller and McFarland as an individual. Paragraph 13 of the 1936 contract clearly contemplates a transfer of the right of publicity to the name of McFarland, but this transfer is restricted to the duration of the contract plus one year. See App. at A-143. In addition, Paragraphs 19 and 20 transfer certain rights regarding the use of the nickname and image of the character "Spanky," but the restaurant, by using the name "Spanky McFarland's," appears to be commercially exploiting the image not only of the character "Spanky" but of the actor known through most of his life as George "Spanky" McFarland. Nothing on this record suggests Miller has any rights to the name "Spanky McFarland" other than an allusion that McFarland's right of publicity in his own name has fallen into the public domain, a contention we reject. Thus, we conclude that if McFarland establishes a personal connection with the name Miller sought to profit from, Miller is liable for that misappropriation. The amount of damages, however, may be influenced by the quantum of the right retained by McFarland.
 
 
 47
 Accordingly, we hold that McFarland has set out a claim that raises a triable issue under New Jersey law as to whether he retains a proprietary interest in the name Spanky McFarland.
 
 
 48
 Miller's reliance on the 1936 contract is otherwise misplaced. It defined, inter alia, the relationship between McFarland and a third party, the Studio. We have held, supra, that by virtue of his actions while in the employ of the Studio McFarland generated a proprietary interest in his name and image. The 1936 contract does not seek to convey such publicity rights in perpetuity.[16] Thus, McFarland has alleged facts that would support rights superior to Miller, and the 1936 agreement is ineffective in providing Miller with a defense to McFarland's claim of infringement.[17]
 
 V.
 
 49
 In summary, we hold that in New Jersey, the right of publicity is a proprietary right based on the identity of a character or defining trait that becomes associated with a person when he gains notoriety or fame. The right to exploit the value of that notoriety or fame belongs to the individual with whom it is associated and a cause of action for its infringement that took place during the lifetime of the individual with whom the fame is associated descends to the personal representative of the holder in New Jersey. We conclude that by virtue of his on-screen portrayal of a cherubic boy in the "Our Gang" comedy series, McFarland developed an exploitable interest to which he may lay claim if he can persuade a fact finder that he has become identified with the name Spanky. There is no individual or entity presently before this court that has superior claim to the publicity value of the nickname Spanky. Accordingly, we will remand to the district court with instruction to vacate the summary judgment entered in favor of Miller and Anaconda and for further proceedings consistent with this opinion.
 
 
 
 *
 Hon. John P. Fullam, District Judge of the United States District Court for the Eastern District of Pennsylvania, sitting by designation
 
 
 [1]
 During the pendency of this appeal, the initial plaintiff, George McFarland, passed away. Pursuant to Federal Rule of Appellate Procedure 43(a), McFarland's wife and personal representative, Doris, has been substituted as a party
 
 
 [2]
 The caption of this case indicates that the appellees are Miller and "Andaconda, Inc." However, in the answer to the complaint, as well as the bankruptcy order lifting the automatic stay and permitting this appeal to proceed, "Andaconda" is referred to as "Anaconda." We will call the appellee "Anaconda" in this opinion
 
 
 [3]
 The "Our Gang" series ultimately spanned 221 films and three decades. For the benefit of later generations, we quote the following description of its theme: "The series' foundation was pitting scruffy, mischievous have-not kids against pretentious rich kids, sissy kids, and in general a hardened, rule-governed, class-conscious adult world that would stand between them and the only thing they were interested in--making their own fun." Leonard Maltin & Richard Bann, The Little Rascals: The Life and Times of Our Gang 4 (1992). Usually light hearted, the "Our Gang" series was quite successful and received an Academy Award as the best short subject film of 1936 for the film Bored of Education. Id. at 5
 
 
 [4]
 Although McFarland attained his greatest fame as a member of the Gang, he also appeared in minor roles in a number of full-length feature films such as M-G-M's Day of Reckoning (1933), Paramount's Miss Fane's Baby is Stolen (1934), RKO-Radio's Kentucky Kernels (1935) (playing a character named "Spanky"), M-G-M's O'Shaughnessy's Boy (1935) (also starring Jackie Cooper and Wallace Beery), Paramount's early Technicolor western Trail of the Lonesome Pine (1936), Warner Bros.' Variety Show (1937) (with Dick Powell), and RKO's Peck's Bad Boy with the Circus (1938). See Maltin, supra note 3 at 262. Apparently McFarland's name only appeared once as "George McFarland" in the credits for Variety Show. In all other appearances, he was called Spanky McFarland. Id
 After leaving the Gang, McFarland had a small part in Republic's Johnny Doughboy (1943) with fellow former Gang member Carl "Alfalfa" Switzer.
 
 
 [5]
 While $250.00 a week may indeed have been a handsome sum in 1936, we note that the "Our Gang" dog, Pete, had been signed to a contract in 1927 that ultimately paid his owners $225.00 a week for Pete's services. Maltin, supra note 3 at 282
 
 
 [6]
 McFarland admitted in deposition that there was a time when he attempted to distance himself from his screen persona and identified himself simply as George McFarland in his business activities. He had, however, usually appeared as Spanky McFarland. Included in the appearances as Spanky were a 1958 stint hosting an "Our Gang" revival in Tulsa, Oklahoma, a 1984 appearance at the Academy Awards where he presented a special Oscar to Hal Roach, and an April 22, 1993, appearance on the television series Cheers
 As Spanky, McFarland also endorsed the products of a boot company, promoted Republic studios, participated in celebrity events, performed at college campuses, signed autographs at shows and derived income from "Spanky McFarland's Bar-B-Que" and "Spanky's Clubhouse," two Oklahoma City, Oklahoma, restaurants.
 McFarland actively protected the right to license his name. We are aware of at least four other actions where he sought a judicial remedy for misappropriation of his name and likeness. See McFarland v. E & K Corp., Civ. No. 4-89-727, 1991 WL 13728, 18 U.S.P.Q.2d 1246 (D.Minn.1991) (settled and dismissed); McFarland v. Eklund Rascals, Inc. d/b/a/ Spanky's Famous Deli-Best of Medford, et al., CV-91-2895 (E.D.N.Y.) (granting injunctive relief and damages, resolved by a consent order and dismissed); McFarland v. Falango, CV-92-2177 (E.D.N.Y.) (pending action to enjoin the operation of an establishment named "Spanky's Famous Deli"); McFarland v. Speakeasy of Collier County, Inc., (M.D.Fla.) (pending action to enjoin the operation of an establishment named "Spanky's Speakeasy").
 
 
 [7]
 Miller stated in his deposition that he commissioned a copyright and trademark search that yielded no conflict. He also contacted King World, the current owner of the "Our Gang" series, at some later date to confirm the absence of a copyright on the name
 
 
 [8]
 At Anaconda's restaurant, one can choose among "Spanky's Steak Sandwich," "Rascal's Choice," "Buckweet's Basket," and "Alfalfa's Sprout Burger."
 
 
 [9]
 Between the filing of this appeal and oral argument, Anaconda filed a bankruptcy petition. As a result, this case was stayed for a time, but McFarland sought and received relief from the stay by order of the bankruptcy court dated December 15, 1992, permitting the appeal to proceed. In re Anaconda, Inc., No. 92-35921 (Bankr.N.J. Dec. 15, 1992)
 
 
 [10]
 The Latin translates "a personal action dies with the person."
 
 
 [11]
 In New Jersey, to sustain an action claiming misappropriation of the image of another, a commercial purpose must be present. Tellado v. Time-Life Books, Inc., 643 F.Supp. 904, 909 (D.N.J.1986); Bisbee v. John C. Conover Agency, 186 N.J.Super. 335, 452 A.2d 689, 693 (1982). In the instant case, it is undisputed that Miller utilized McFarland's nickname "Spanky" in a commercial manner
 
 
 [12]
 It is for this reason that the district court relied on the 1936 contract to define the rights of the parties
 
 
 [13]
 While this issue would have controlled Lugosi, the court instead held that any exploitable proprietary interest Bela Lugosi had in his portrayal of Count Dracula did not descend to his personal representative
 
 
 [14]
 Justice Mosk contrasted that case with Gregory Peck's role as General MacArthur, George C. Scott's role as General Patton, James Whitmore playing Will Rogers and Charlton Heston playing Moses, as well as Bela Lugosi as Dracula. Justice Mosk believed these actors had no proprietary interest in their roles
 
 
 [15]
 We think the case in which an actor becomes known for a single role such as Batman is different. See Carlos V. Lozano, West Loses Lawsuit Over Batman TV Commercial, L.A. Times, Jan. 18, 1990, at B3 (Actor Adam West failing in bid to stop retail chain from using a Batman in a commercial that West argued invoked his portrayal). West's association with the role of Batman or Johnny Weismuller's with the role of Tarzan is different than McFarland's identification with Spanky. West's identity did not merge into Batman and Weismuller did not become indistinguishable from Tarzan. McFarland, like Groucho Marx, may have become indistinguishable in the public's eye from his stage persona of Spanky
 
 
 [16]
 In fact, paragraph thirteen of the agreement makes a limited conveyance to the Studio of the "right to make use of the name of McFARLAND, for advertising, commercial and/or publicity purposes, as well as the sole and exclusive right to make use of and distribute his pictures, photographs and/or other reproductions of his physical likeness for such purposes" for only the term of the agreement plus one year. App. at A-143
 
 
 [17]
 We will, however, affirm the district court's grant of summary judgment for Miller on McFarland's claim for an invasion of his right of privacy, count one of his complaint. In his complaint, McFarland alleges that the restaurant's use of his name caused him "deprivation of property, lost earnings, humiliation, embarrassment, emotional and mental distress, pain and suffering." App. at A-12. The first two elements are properly considered under the right of publicity claim and McFarland has not presented evidence of humiliation, embarrassment, or mental distress sufficient to support a claim of invasion of privacy
 With respect to McFarland's claims under the Lanham Act, the New Jersey Consumer Fraud Act and unjust enrichment, it follows from our holding on the right of publicity that the district court also erred in granting summary judgment for Miller on these claims. On them, there also remain disputed material facts. Accordingly, McFarland's motion for summary judgment was properly denied.